CARDIO–MEDICAL ASSOCIATES, LTD. and Thomas J. McBride, M.D. and Paul T. Cass, M.D. and C. Richard Schott, M.D. and Michael B. Goodkin, M.D., Plaintiffs,

v.

CROZER–CHESTER MEDICAL CENTER and James H. Loucks, M.D., Michael C. Boyd, William J. Breece, John F. Cramp, Esquire, Daniel R. Curran, Mary E. Dale, Conrad A. Etzel, M.D., Jeremiah A. Hartley, Joseph R. Layton, Reverend David A. MacQueen, Peter L. Miller, William B. Mitchell, Jr., Clarence R. Moll, Ph.D., J. Harold Perrine, Malcolm B. Petrikin, Esquire, and Bertram M. Speare, individually and as members of the Crozer-Chester Medical Center Board of Directors and James Clark, M.D., Chief of Department of Medicine of Crozer-Chester Medical Center and Daniel J. MARINO, M.D., R. David Mishalove, M.D., Joel A. Krackow, M.D., Adrian S. Weyn, M.D., Peter Lavine, M.D., Michael Yow, M.D., and Ancil Jones, M.D. c/a Cardiology Associates of Delaware County.

Civ. A. No. 81–3050.

United States District Court, E.D. Pennsylvania.

Nov. 15, 1982.

See also, D.C., 536 F.Supp. 1065.

Howard Richard and Lynn B. Schoenfeld, Media, Pa., and David Berger, Philadelphia, Pa., for plaintiff.

John W. Wellman, Media, Pa., and H. Robert Halper, Washington, D.C., for Crozer-Chester.

H. Robert Fiebach, Philadelphia, Pa., for Cardiology Assoc.

TABLE OF CONTENTS

I. Preliminary Statement ................. 1173

II. Standards Under Which Defendants' Motion Must be Decided ............... 1175

 A. Rule 12(b)(1) ...................... 1175

 B. Review of Standards Developed in Previous Opinion ............... 1175

 1. Pleading Standards ........... 1175
 2. Substantive Sherman Act Standards .................. 1176

 C. Analytic Framework .............. 1180

 1. Each Case Turns on Its Own Facts ...................... 1180
 2. Considerations Bearing on the Tripartite Jurisdictional Test .... 1181

 a. Nature of the alleged restraint ................. 1181
 b. Nature of the plaintiff ..... 1183

III. Application of Legal Standards to Plaintiffs' Sherman Act Allegations ............ 1184

 A. Introductory Statement ............. 1184

 B. "In Commerce" Theory ............. 1185

 C. "Affecting Commerce" Theory ....... 1186

 1. Treatment of Out-of-State Patients by Plaintiffs .......... 1187
 2. Interstate Flow of Revenues to Plaintiffs .................. 1190
 3. Use of Medical Equipment and Medical Supplies by Plaintiffs ... 1192
 4. Use of Automobiles, Gasoline, and Other Equipment by Plaintiffs ... 1194
 5. Prescriptions of Drugs and Medicines by Plaintiffs ........ 1195
 6. Dissuasion of Out-of-State Physicians From Associating with Plaintiffs ............... 1197
 7. Inflating of Fees for Cardiology Services .................... 1198
 8. Diminished Interstate Investments in Plaintiffs' Pension Portfolio .. 1200
 9. Curtailment of Plaintiffs' Practice in Connection with a New Jersey Clinic ...................... 1201
 10. Lessening of Use of Out-of-State Continuing Education .......... 1201
 11. Summary ................... 1202

 D. Consistency with Prior Precedent ..... 1202

IV. Conclusion .......................... 1205

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

### I. Preliminary Statement

Plaintiff Cardio-Medical Associates, Ltd., and its four physician members, brought this antitrust action against Crozer-Chester Medical Center (hereinafter referred to as "CCMC"), members of the CCMC Board of Directors, and the Chief of the Department of Medicine at CCMC (hereinafter referred to as "the CCMC defendants"), as well as several individual doctors practicing cardiology under the name of Cardiology Associates of Delaware County (hereinafter referred to as "Cardiology Associates"). Plaintiffs allege that the denial to them of

certain specialized staff privileges in cardiology at CCMC violates both sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), and section 4 of the Clayton Act, 15 U.S.C. § 15 (1976).

Plaintiffs originally filed this action on July 30, 1981. In their original complaint, plaintiffs alleged that the denial to them of such privileges resulted from an unlawful conspiracy by defendants that restrained trade in violation of sections 1 and 2 of the Sherman Act. Plaintiffs also alleged that defendants' conduct violated plaintiffs' fourteenth amendment rights and, therefore, constituted a deprivation of a constitutionally protected property or liberty interest within the meaning of 42 U.S.C. § 1983 (1976). Pursuant to rule 12(c), the CCMC defendants, later joined by Cardiology Associates, filed a motion for judgment on the pleadings on the grounds that plaintiffs had failed to state a claim for relief or establish that this court had subject matter jurisdiction with respect to either count of the original complaint.

On March 15, 1982, I issued an opinion and order granting defendants' motion for judgment on the pleadings. *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center,* 536 F.Supp. 1065 (E.D.Pa.1982). Count II of plaintiffs' original complaint, which alleged violations of the Constitution and section 1983, was dismissed with prejudice. Count I, however, which alleged that the actions of defendants violated the antitrust laws, was dismissed without prejudice and I granted plaintiffs sixty days to file an amended complaint.

On May 13, 1982, plaintiffs, with the assistance of new counsel, filed a thirty-eight page, sixty-five paragraph amended complaint. In fifty-five paragraphs of introductory allegations, plaintiffs attempt to plead jurisdiction and venue; the identity of the parties; the identification of relevant product markets; the alleged effects that defendants' activities have on interstate trade and commerce; and the activities al-

legedly constituting defendants' conspiracy, unreasonable restraint of trade, and group boycott of plaintiffs. Count I of plaintiffs' amended complaint then states their Sherman Act section 1 claim while Count II states their Sherman Act section 2 claim.

Thus, plaintiffs' amended complaint alleges, as did Count I of their original complaint, that defendants have prohibited plaintiffs from practicing certain cardiology procedures at CCMC in violation of sections 1 and 2 of the Sherman Act. On the basis of these allegations, plaintiffs seek permanent injunctive relief compelling defendants to permit plaintiffs to perform the specified procedures from which they allegedly have been wrongfully excluded. Plaintiffs also seek damages for the injuries allegedly sustained as a result of the denial of the opportunity to perform these procedures as well as attorneys' fees and costs.

Pursuant to rule 12(b)(1) of the Federal Rules of Civil Procedure, the CCMC defendants have moved to dismiss plaintiffs' amended complaint for lack of subject matter jurisdiction.[1] Defendants' decision to proceed under rule 12(b)(1) as opposed to rule 12(b)(6) was dictated by my holding in the original *Cardio-Medical* opinion that "[t]he Third Circuit uniformly approaches the interstate commerce issue as one of jurisdiction." *Cardio-Medical,* 536 F.Supp. at 1079 n. 15.

For the reasons stated below, I grant defendants' motion to dismiss as to both counts of plaintiffs' amended complaint, and, having already afforded plaintiffs the opportunity to amend their complaint, dismiss their cause of action with prejudice. Again,

> I write at some length because of the increasing significance—to doctors, to hospitals, and to the federal courts—of this genre of cases. The large financial and administrative burdens imposed on hospital defendants and the courts as a result of the growing number of denial of hospital staff privileges cases, notwith-

---

1. Cardiology Associates has joined the CCMC defendants' motion to dismiss so all defendants

are presently parties to the instant motion.

standing the infrequency with which plaintiffs prevail, is only one reason for this topic's current importance. Further, my analysis of the case law discloses no comprehensive discussion of the theories underlying and of the standards to be applied in deciding claims of this type.

*Cardio-Medical,* 536 F.Supp. at 1069.

## II. Standards Under Which Defendants' Motion Must be Decided

### A. Rule 12(b)(1)[2]

■ Under the applicable Third Circuit precedents, rule 12(b)(1) is the appropriate procedural vehicle for the testing of antitrust jurisdictional challenges. *See, e.g., Mortensen v. First Federal Savings & Loan Ass'n,* 549 F.2d 884 (3d Cir.1977); *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48 (3d Cir.1973); *Daley v. St. Agnes Hospital, Inc.,* 490 F.Supp. 1309 (E.D. Pa.1980). The Third Circuit, however, has been emphatic in its identification of a "crucial distinction" between rule 12(b)(1) motions that attack a complaint on its face and rule 12(b)(1) motions that attack a complaint factually (i.e., through the introduction of materials outside the pleadings). *Mortensen,* 549 F.2d at 891.

Whenever the court treats a rule 12(b)(1) motion to dismiss as a facial challenge to the legal sufficiency of the pleading, it must afford the plaintiff the same safeguards as would be available to the plaintiff in a rule 12(b)(6) motion:

> Because 12(b)(6) results in a determination on the merits in an early stage of plaintiff's case, the plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn. The decision disposing of the case is then purely on the legal sufficiency of plaintiff's case: even were plaintiff to prove all its allegations he or she would be unable to prevail. In the interest of judicial economy it is not

improper to dispose of the claim at that stage.

*Id.*

If the rule 12(b)(1) attack is a factual one, however, the trial court proceeds in an entirely different manner. As the Third Circuit explained in *Mortensen,* "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Id.*

It should be made clear at the outset that it is my apprehension that defendants' rule 12(b)(1) challenge in this case is a facial challenge to the legal sufficiency of plaintiffs' amended complaint. Neither party has attempted to introduce materials outside the pleadings; thus, in reaching my decision, I have not moved beyond the pleadings. My decision is, therefore, based strictly on a reading of plaintiffs' complaint, in the light most favorable to plaintiffs, together with any facts of which I am entitled to take judicial notice. *See* 2A J. Moore, *Moore's Federal Practice* ¶ 12.15, at 2343–44 (1981).

### B. Review of Standards Developed in Previous Opinion

### 1. Pleading Standards

The initial *Cardio-Medical* opinion contained an extensive discussion of the general disfavor with which all motions for summary disposition of cases are treated in federal courts. *See Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center,* 536 F.Supp. 1065, 1070–72, 1078–79 (E.D.Pa. 1982). To summarize, I reasoned that the line between permissible and impermissible summary disposition of cases had to be drawn as the result of an analysis of two competing policies: the "notice pleading" policy and the "efficiency" policy:

---

**2.** Rule 12(b)(1) reads as follows:

(b) *How Presented.*

Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading

thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, . . .

Fed.R.Civ.P. 12(b)(1)

Generally, summary disposition of claims on the merits is disfavored. If a complaint contains even the most basic of allegations that, when read with great liberality, could justify plaintiff's claim for relief, motions for judgment on the pleadings should be denied. Nevertheless, a district court judge still must scrutinize complaints to ensure that they contain even these most basic and minimum allegations. This scrutiny is particularly appropriate in a case in which a party questions the jurisdiction of the court because of the federal judge's special responsibility to determine that there is jurisdiction in each case.

. . . .

Notwithstanding the liberal amendment provisions of the federal rules, summary dismissal of a facially deficient complaint, without leave to amend or conduct discovery, is appropriate in the following situations: (1) if "the merits of the controversy can be fairly and fully decided" without amendment or discovery, as, for example, if plaintiff's complaint is legally deficient and, after inquiry by the court, plaintiff can suggest no way in which it can be made legally sufficient, *see* [C. Wright & A. Miller, *Federal Practice and Procedure* § 1369, at 698 (1969); *Cardio-Medical,* 536 F.Supp. at 1071 n. 4]; ... or (3) if the pleadings are wholly inadequate and discovery would serve no demonstrably useful purpose, [*Cardio-Medical,* 536 F.Supp. at 1072 n. 5].

*Id.* at 1072.

The initial *Cardio-Medical* opinion emphasized that these same standard federal

pleading requirements "apply with full force to complaints in complex antitrust matters." *Id.* at 1079. In antitrust matters, I continue to subscribe fully to the remarks of the trial judge in *Searer v. West Michigan Telecasters, Inc.,* 381 F.Supp. 634 (W.D.Mich.1974), *aff'd mem.* 524 F.2d 1406 (6th Cir.1975), who held:

It is true that summary procedure should be used sparingly in complex antitrust litigation. . . . However, this policy of restraint is no warrant for every plaintiff who can draft an antitrust complaint, no matter how groundless or improbable its allegations, to force his claim to trial despite its deficient factual underpinning.

*Id.* at 643.

### 2. Substantive Sherman Act Standards

Section 1 of the Sherman Act declares that contracts, conspiracies, and combinations in restraint of trade or commerce among the states are illegal.[3] In addition, section 2 prohibits attempts to monopolize the sale of products or services in trade or commerce among the states.[4]

"Coverage of the Sherman Act, legislation passed pursuant to the authority granted Congress by the Commerce Clause, extends both to activities that are actually *in* interstate commerce and to activities that, though purely intrastate in character, nevertheless, substantially *affect* interstate commerce." *Cardio-Medical,* 536 F.Supp. at 1073 (emphasis in original). *Accord McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980); *Hospital Building Co. v. Trus-*

---

3. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
15 U.S.C. § 1 (1976).

4. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
15 U.S.C. § 2 (1976).

tees of the Rex Hospital, 425 U.S. 738, 743, 96 S.Ct. 1848, 1851, 48 L.Ed.2d 338 (1976); United States v. Employing Plasterers Ass'n, 347 U.S. 186, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618 (1954); Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 435, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932). Although the distinction between activities "in" commerce and activities that only "affect" commerce is still important for limited purposes under the antitrust laws, "the jurisdictional requirement of the Sherman Act may be satisfied under either the 'in commerce' or the 'effect on commerce' theory." McLain, 444 U.S. at 242, 100 S.Ct. at 509. See Cardio-Medical, 536 F.Supp. at 1073 (citing cases).

■ In order to satisfy the "in commerce" theory of Sherman Act jurisdiction, a plaintiff must demonstrate that its business is "actually in interstate commerce" or that its business, though essentially local in nature, is an "integral part of or 'essential and inseparable from' an interstate transaction." Heille v. City of St. Paul, 512 F.Supp. 810 at 812–813 (D.Minn.1981), aff'd, 671 F.2d 1134 (8th Cir.1982). See also Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).[5]

■ In order to satisfy the "affecting commerce" test, plaintiffs' amended complaint must contain factual allegations that, if proved, would sustain each of three independent underlying findings: (i) the presence of interstate commerce; (ii) the existence of a substantial and adverse effect on interstate commerce; and (iii) the requisite nexus between the challenged activities of defendants and the effect on the relevant channel of interstate commerce. See Cardio-Medical, 536 F.Supp. at 1074. "Failure to allege sufficient facts on any one of these jurisdictional prerequisites requires dismissal of plaintiffs' [amended] complaint." Id.

Plaintiffs' jurisdictional burden under this tripartite standard could not have been made clearer in my last opinion. Plaintiffs must first specifically identify the element or elements of interstate commerce implicated in the case. See McLain, 444 U.S. at 242, 100 S.Ct. at 509. Critically, the identified aspect of interstate commerce must relate to the activities of plaintiffs, and not defendants. See Cardio-Medical, 536 F.Supp. at 1076–78.

■ Plaintiffs' complaint then must contain specific factual allegations that, if proved, would demonstrate that the challenged action of defendants "substantially and adversely affects interstate commerce." Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974). See Cardio-Medical, 536 F.Supp. at 1074 (collecting cases). Previous cases have exhaustively defined the scope of this substantiality test. Sherman Act jurisdiction cannot be established and the substantiality requirement cannot be met through allegations of effects on commerce that are "incidental," "inconsequential," or "de minimis." See Rosemound Sand & Gravel Co. v. Lambert Sand & Gravel Co., 469 F.2d 416, 418 (5th Cir.1972); Searer v. West Michigan Telecasters, Inc., 381 F.Supp. 634, 640–41 (W.D.Mich.1974), aff'd mem. 524 F.2d 1406 (6th Cir.1975); Marston v. Ann Arbor Property Managers Ass'n, 302 F.Supp. 1276, 1279–80 (E.D.Mich.1969), aff'd, 422 F.2d 836 (6th Cir.1970), cert. denied, 399 U.S. 929, 90 S.Ct. 2244, 26 L.Ed.2d 796 (1970). Further, the requisite allegations on substantiality cannot be satisfied through vague or conclusory statements in the complaint. See Wolf v. Jane Phillips Episcopal-Memorial Medical Center, 513 F.2d 684 (10th Cir. 1975); Cardio-Medical, 536 F.Supp. at 1078–

---

5. Plaintiffs' original complaint and original set of attorneys attempted to establish antitrust jurisdiction by relying only on the "affecting commerce" theory. See Cardio-Medical, 536 F.Supp. at 1073 n. 8. Plaintiffs' new attorneys, however, argue the "in commerce" theory of Sherman Act jurisdiction as well. See Transcript of Oral Argument on Defendants' Motion to Dismiss at 2–3 (July 29, 1982). Although I have been unable to locate, and neither plaintiffs' counsel nor defendants' counsel have been able to cite, any denial of hospital staff privileges or physicians services case in which the "in commerce" jurisdictional theory has been applied, I will consider plaintiffs' arguments under this approach.

79; *Grigg v. Blue Cross and Blue Shield of Michigan,* 1980–2 Trade Cas. (CCH) ¶ 63,500 (E.D.Mich.1980).

█ Finally, plaintiffs must allege with specificity the logical nexus between the challenged activities of defendants (in this case, denying plaintiffs the right to practice specialized cardiology procedures) and the effect on the relevant channel of interstate commerce identified previously. *See Cardio-Medical,* 536 F.Supp. at 1074; *Daley v. St. Agnes Hospital, Inc.,* 490 F.Supp. 1309 (E.D.Pa.1980).[6]

█ Implicit in this tripartite jurisdictional test, particularly in the substantiality and nexus requirements, is my view that a mere shifting in the flow of interstate commerce or the simple substitution of one party for another in that flow does not establish a "substantial and adverse effect" on interstate commerce for purposes of Sherman Act jurisdiction, at least in a case such as this in which plaintiffs have not been totally foreclosed from practicing their profession in the relevant market. It is my view that the case law firmly supports my holding.

For example, in *Cartrade, Inc. v. Ford Dealers Advertising Association of Southern California,* 446 F.2d 289 (9th Cir.1971), *cert. denied,* 405 U.S. 997, 92 S.Ct. 1249, 31 L.Ed.2d 465 (1972), the Ninth Circuit held that there was no effect on commerce in a case in which plaintiff, an automobile trading agency, was replaced by another agency established through the joint efforts of the defendants in that case. Although the court of appeals acknowledged that the business of the plaintiff Cartrade affected interstate commerce, it ruled that the actions of the defendants in replacing the plaintiff with a new agency had no effect on interstate commerce.

---

**6.** The position taken by some courts that the *McLain* decision broadens significantly the "affecting commerce" jurisdictional test by requiring only proof of a nexus between interstate commerce and the defendants' general activities rather than between interstate commerce

The district court reached a similar result in *Dominion Parking Corp. v. Baltimore and Ohio Railway Co.,* 450 F.Supp. 441 (E.D.Va. 1978). In *Dominion Parking,* a former lessee of parking lots brought an antitrust action against the owner of the lots and the new lessee following the termination of plaintiff's lease. The district judge rejected plaintiff's argument that the termination had had an effect on interstate commerce, noting that the case "concern[ed] the potential effect on interstate commerce of *substituting* one parking lot operator for another. Although plaintiffs are affected by the substitution, interstate commerce is not." *Id.* at 446 (emphasis supplied).

Most significantly, a shifting of interstate commerce has been found insufficient to sustain jurisdiction in a case involving the denial of hospital staff privileges to a physician. In *Moles v. Morton F. Plant Hospital, Inc.,* 1980–81 Trade Cas. (CCH) ¶ 63,600 (M.D.Fla.1978), *aff'd mem.* 617 F.2d 293 (5th Cir.1980), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 147 (1980), plaintiffs argued that the refusal of defendant hospital to renew or grant them staff privileges resulted in an effect on interstate commerce because their patients' bills were paid by funds that travelled in interstate commerce. In rejecting this argument, the trial judge explained that:

Here all the allegations regard a diminution of interstate insurance payments to plaintiffs, but the flow in interstate commerce would be the same. The effect of the defendants' actions would be on the plaintiffs but not on the flow of interstate commerce. This differs from the *Rex Hospital* case where it was alleged that interstate commerce would be substantially reduced by the loss of plaintiffs' purchases of supplies. Plaintiff hospital in *Rex* also allegedly paid over its revenue to an out-of-state parent cor-

and the defendant's unlawful conduct was discussed extensively in the initial *Cardio-Medical* opinion and rejected. *See Cardio-Medical,* 536 F.Supp. at 1075–76. There is no need to repeat that analysis in this opinion.

poration. Thus, payments were alleged to be reduced by defendants' actions. *Id.* at 77,189.[7]

Plaintiffs vigorously contested the position that a mere shifting of interstate commerce from one business to another does not affect interstate commerce. None of the cases cited by plaintiffs in support of their position even addresses the specific issue underlying my conclusion: whether interstate commerce is substantially burdened, and thus whether antitrust jurisdiction is established, when commerce shifts from one party to another, but otherwise remains unchanged, as a result of an alleged violation of the antitrust laws.

First, the effect on interstate commerce was not at issue in either *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), or *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). The issue in *Klor's* was simply whether harm to one business, as opposed to many, could constitute the requisite "public injury," or competitive harm, required by section 1 of the Sherman Act. Although the Supreme Court held that such harm could constitute the required injury, because the jurisdiction of the federal courts was clear on the record and unchallenged, Justice Black was not required to, and did not, address the interstate commerce jurisdictional issue, much less whether shifting

triggered jurisdiction. On its facts, the *Topco* case is even more remote from the issue under consideration in the instant case. In *Topco,* the only question addressed by the Court was whether the trial court erred in applying the rule of reason rather than a *per se* rule to the alleged violation. Justice Marshall's opinion contains not a single word on the interstate commerce jurisdictional issue, again because of the obviousness of federal jurisdiction independent of any shifting argument.

A second group of cases cited by plaintiffs in support of their position discusses the interstate commerce requirement, but fails to make a specific holding with respect to the shifting issue addressed in the instant case. For example, in *Hospital Building Co. v. Trustees of the Rex Hospital, supra,* the Court simply said that to sustain jurisdiction the restraint must place "unreasonable burdens" on interstate commerce; a substantial and adverse reduction in such commerce would be sufficient. Although shifting was not addressed, *Hospital Building Co.,* by requiring a "burden" on interstate commerce, supports my analysis that a mere shifting would be insufficient to establish jurisdiction. Further, in *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127 (3d Cir.1978),[8] the Third Circuit ruled that an increase in interstate commerce flowing from an alleged restraint may be sufficient to establish federal juris-

---

7. One other relevant case supporting my holding is the Supreme Court's decision in *Exxon Corp. v. Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). Although *Exxon* is a commerce clause case having no direct relationship to the antitrust laws, the Sherman Act was enacted by Congress under authority granted by the commerce clause and is, therefore, limited by that clause itself. *See Hospital Building Co.,* 425 U.S. at 743 n. 2, 96 S.Ct. at 1851 n. 2; *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). The pertinent question under both the commerce clause and the Sherman Act is the extent to which the challenged action impermissibly or unreasonably burdens interstate commerce. *Compare Exxon,* 437 U.S. at 127, 98 S.Ct. at 2214 ("burden" under the commerce clause) with *Hospital Building Co.,* 425 U.S. at 746, 96 S.Ct. at 1853 ("burden" under the Sherman Act). Thus, if the effect of an action does not burden interstate commerce

for purposes of the commerce clause, it cannot burden commerce for purposes of the Sherman Act.

In *Exxon,* the Supreme Court specifically held that a mere shift in the relative proportions of local and out-of-state goods sold in a particular state has "no demonstrable effect whatsoever on the interstate flow of goods." *Exxon,* 437 U.S. at 127 n. 16, 98 S.Ct. at 2214 n. 16. *A fortiori,* a mere shifting in interstate commerce cannot sustain jurisdiction under the Sherman Act.

8. During oral argument on defendants' motion to dismiss, plaintiffs' counsel conceded that plaintiffs' entire position on the shifting issue was, in fact, grounded on plaintiffs' interpretation of the *Friedman* case. *See* Transcript of Oral Argument on Defendants' Motion to Dismiss, at 58–59 (July 29, 1982).

diction.[9] The court of appeals, however, did not address the issue whether a mere shifting in the flow of interstate commerce would be sufficient. *Friedman* is, therefore, wholly consistent with the result that I reach in the instant case: plaintiffs must allege facts that, if proved, would support a finding that there has been some *change* (either an increase or a decrease) in the flow of interstate commerce.

Only one case cited by plaintiffs discusses shifting, but the discussion appears in a context distinct from the interstate commerce question. Following *Friedman,* the Tenth Circuit held in *Mishler v. St. Anthony Hospital Systems,* 1981–2 Trade Cas. (CCH) ¶ 64,342 (10th Cir.1982), that an increase in interstate commerce may constitute the requisite "unreasonable burden on commerce" necessary to vest a federal trial court with jurisdiction. *Id.* at 74,586. The court of appeals then addressed an entirely different issue—whether a diversion of revenues can constitute the "requisite harm to the public," *id.,* necessary for an antitrust violation. Its answer in the affirmative, just like the *Klor's* decision discussed above, is totally separate from an inquiry into whether interstate commerce has been implicated sufficiently to grant a federal court jurisdiction over the cause of action.

In sum, I hold that, at least in a case in which the plaintiff has not been foreclosed from doing business in the relevant market, a mere shifting in commerce from one party to another as a result of a restraint allegedly violative of the antitrust laws is insufficient in and of itself to vest a federal trial court with jurisdiction over an antitrust case.[10]

**9.** Until its decision in *Friedman,* the Third Circuit had always analyzed the "effects" test of the interstate commerce requirement in terms of whether a *reduction* in the flow of interstate commerce was alleged. *E.g., Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48, 53 (3d Cir.1973). Thus, even after *Friedman,* the Third Circuit has consistently viewed the interstate commerce test as requiring a *showing of some change,* either an increase or a decrease, in the overall flow of interstate commerce involved.

## C. Analytic Framework

My decision in the instant case turns on more than application of these general standards of law to the allegations contained in plaintiffs' amended complaint. Following a review of every decided denial of hospital staff privileges case, as well as a large selection of antitrust jurisdiction cases involving the health-care industry, there emerges an analytic framework that both explains the jurisdictional determinations made in the previous cases and assists me in reaching a decision on this case.

### 1. Each Case Turns on Its Own Facts

The first crucial principle in my analytic framework is that each denial of hospital staff privileges case must turn on its own peculiar and unique facts. The Third Circuit has emphasized that an evaluation of the sufficiency of interstate commerce allegations

> requires "a practical, case-by-case economic judgment, not a conclusion derived from application of abstract or mechanistic forumlae [*sic*]." *Rasmussen v. American Dairy Ass'n,* 472 F.2d 517, 523 (9th Cir.1972); *see Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 232–233 [68 S.Ct. 996, 1004–1005, 92 L.Ed. 1328] . . . (1948). That is, the issue is one of degree which defies precise tests and which necessarily yields somewhat imprecise resolutions.

As a result, the precedent in this area is unlikely to dictate the outcome in any given case. Instead, it is more likely to communicate a general sense as to how much of an impact local activities must have upon interstate commerce before they confer jurisdiction. . . .

**10.** In some respects, the position that I have taken on defendants' shifting argument might well be dispositive of defendants' motion to dismiss. In most respects, however, my holding that this court is without jurisdiction to adjudicate plaintiffs' claims is premised on a number of independent considerations, including the shifting argument. As a result, it might be said that my position on shifting is a sufficient, but not necessary, basis justifying dismissal of plaintiffs' complaint.

*Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48, 51 (3d Cir.1973). *Accord Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715, 717 (10th Cir.1980) (citing *Doctors* with approval), *rev'd on other grounds,* 637 F.2d at 719 (10th Cir.1981) (*en banc*); *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127, 132 (3d Cir. 1978) (emphasizing that effect on interstate commerce must be viewed on a case-by-case basis).

The Ninth Circuit has taken the same view on this issue, but still emphasized the obligation of a federal trial judge to draw some line when evaluating plaintiffs' jurisdictional allegations:

A determination of whether the interstate commerce requirement of the Sherman Act has been met requires an evaluation of the particular facts presented in each case. The cases do not provide easily applicable standards for determining whether the necessary relationship with interstate commerce exists. [*See Rasmussen v. American Dairy Ass'n,* 472 F.2d 517, 527 n. 20 (9th Cir.1972), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).] . . .

We find it unnecessary to catalog the facts of each case cited by the parties, as there emerges no "bright line" dividing the cases in which the required nexus with interstate commerce has been found and those in which it has not. In *Rasmussen, supra,* 472 F.2d at 526, we noted this difficulty yet emphasized that some line must be drawn "or federal regulation is boundless."

*Thornhill Publishing Co., Inc. v. General Telephone & Electronics Corp.,* 594 F.2d 730, 739 (9th Cir.1979).

2. *Considerations Bearing on the Tripartite Jurisdictional Test*

With full cognizance of the cautionary instructions given by both the Third and Ninth Circuits, I have identified two considerations that influence the practical economic judgments a trial court is required to make when assessing a facial challenge to its own jurisdiction: the nature of the alleged restraint in each case and the nature of the specific plaintiff in each case. My evaluation of these two considerations—the second and third parts of my framework—results in a nearly complete harmonization of what might appear to be harshly conflicting precedents.

a. *Nature of the alleged restraint*

The second part of my framework to aid in the analysis of denial of hospital staff privileges claims is the nature of the alleged restraint in each particular case. In all but one denial of hospital staff privileges or related health-care industry case in which there has been an ultimate finding that federal jurisdiction under the Sherman Act exists, the alleged restraint involved was either an industry or class-wide combination or boycott or a total exclusion from participation in the trade or business at issue. *Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (total boycott of a major hospital); *Hahn v. Oregon Physicians' Service and Physicians' Association of Clackamas County,* 1982–2 Trade Cas. (CCH) ¶ 64,970 (9th Cir.1982) (exclusion of four podiatrists from insurance coverage; complaint worded in class-action-like terms); *Mishler v. St. Anthony's Hospital Systems,* 1981–2 Trade Cas. (CCH) ¶ 64,342 (10th Cir.1981) (total exclusion from emergency room referral list of the major regional hospital in the area); *Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715 (10th Cir.1981) (*en banc*) (total exclusion including restrictions on outside laboratory owned by plaintiff); *Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530 (5th Cir.1978) (attempted destruction of plaintiff's clinic), *cert. denied sub nom. Palmer v. Feminist Women's Health Center, Inc.,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979); *Ballard v. Blue Shield of Southern West Virginia, Inc.,* 543 F.2d 1075 (4th Cir.1976) (denial of all insurance proceeds for chiropractic services in an entire state), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977); *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48 (3d Cir.1973) (alleged inability

to survive by major hospitals in the Philadelphia metropolitan area); *Everhart v. Jane C. Stormont Hospital and Training School for Nurses,* 1982–1 Trade Cas. (CCH) ¶ 64,703 (D.Kan.1982) (total denial of staff privileges to one doctor by three hospital defendants); *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center,* 1982–1 Trade Cas. (CCH) ¶ 64,498 (N.D.Ill.1981) (total denial of staff privileges by one hospital in which plaintiff physician had practiced medicine for one year); *Malini v. Singleton & Associates,* 516 F.Supp. 440 (S.D.Tex. 1981) (total denial of staff privileges by three hospital defendants); *Feldman v. Jackson Memorial Hospital,* 509 F.Supp. 815 (S.D.Fla.1981) (although not a class action, complaint alleges general denial to all podiatrists; also alleges total destruction of business); *Hyde v. Jefferson Parish Hospital District No. 2,* 513 F.Supp. 532 (E.D.La. 1981) (total denial of staff privileges), *rev'd on other grounds,* 686 F.2d 286 (5th Cir. 1982); *Robinson v. Magovern,* 456 F.Supp. 1000 (W.D.Pa.1978) (total denial of staff privileges); *Zamiri v. William Beaumont Hospital,* 430 F.Supp. 875 (E.D.Mich.1977) (total denial of staff privileges). *See also J.P. Mascaro & Sons, Inc. v. William J. O'Hara, Inc.,* 565 F.2d 264 (3d Cir.1977) (alleged industry-wide price fix). *But see Stone v. William Beaumont Hospital,* No. 79–74212 (E.D.Mich. Aug. 17, 1981) (denial of heart catheterization privileges).

On the other hand, the cases in which the ultimate decision was a holding that federal jurisdiction did not exist usually involve only partial restraints on the plaintiff's ability to conduct his profession.[11] *Wolf v. Jane Phillips Episcopal-Memorial Medical Center,* 513 F.2d 684, 685 (10th Cir.1975) (total exclusion of one doctor from two local hospitals); *Elizabeth Hospital, Inc. v. Richardson,* 269 F.2d 167 (8th Cir.) (denial of county medical society membership to chief of staff of plaintiff hospital; both hospital and chief of staff continued to practice

medicine), *cert. denied,* 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959); *Riggall v. Washington County Medical Society,* 249 F.2d 266 (8th Cir.1957) (denial of county medical society membership to one doctor; doctor continued to practice medicine), *cert. denied,* 355 U.S. 954, 78 S.Ct. 540, 2 L.Ed.2d 530 (1958); *Spears Free Clinic & Hospital for Poor Children v. Cleere,* 197 F.2d 125 (10th Cir.1952) (defendants prevented licensing of plaintiff clinic; clinic still operated); *Pao v. Holy Redeemer Hospital,* No. 81–2918 (E.D.Pa. March 17, 1982) (ophthamological surgeon on staff at a number of other hospitals denied privileges at defendant hospital), *after amended complaint,* 547 F.Supp. 484 (E.D.Pa.1982) (dismissing antitrust count for failure to state a claim); *Nara v. American Dental Ass'n,* 526 F.Supp. 452 (W.D.Mich.1981) (American Dental Association suspended plaintiff's membership; plaintiff still practiced medicine as a dentist); *Barr v. National Right to Life Committee, Inc.,* 1981–2 Trade Cas. (CCH) ¶ 64,315 (M.D.Fla.1981) (denial of staff privileges to one doctor at two hospitals); *Grigg v. Blue Cross and Blue Shield of Michigan,* 1980–2 Trade Cas. (CCH) ¶ 63,500 (E.D.Mich.1980) (two ear-and-throat doctors excluded from one union health plan); *Daley v. St. Agnes Hospital, Inc.,* 490 F.Supp. 1309 (E.D.Pa.1980) (nursing supervisor blacklisted by former employer); *Moles v. Morton F. Plant Hospital, Inc.,* 1980–81 Trade Cas. (CCH) ¶ 63,600 (M.D.Fla.1978) (two local doctors excluded from the staff of one local hospital); *Capili v. Shott,* No. 78–1009–B1 (S.D.W.Va. March 15, 1978), *aff'd,* 620 F.2d 438 (4th Cir.1980) (one doctor totally excluded from the staff of one hospital); *Sokol v. University Hospital, Inc.,* 402 F.Supp. 1029 (D.Mass.1975) (total exclusion of one doctor from the staff of one hospital); *Harron v. United Hospital Center, Inc.,* 384 F.Supp. 194 (N.D.W.Va.1974) (total exclusion of one doctor from the staff of one hospital), *rev'd on other grounds,* 522

---

11. It is obvious that many of the cases in which the federal courts have found themselves without Sherman Act jurisdiction involve total restraints quite similar to those pleaded in some of the cases in which jurisdiction has been found to exist. These apparent contradictions, however, are harmonized in the third consideration of my framework—the nature of the specific plaintiff in each case. *See* part II.C.b. *infra.*

F.2d 1133 (4th Cir.1975), *cert. denied,* 424 U.S. 916, 96 S.Ct. 1116, 47 L.Ed.2d 321 (1976); *Nankin Hospital v. Michigan Hospital Service,* 361 F.Supp. 1199 (E.D.Mich. 1973) (local hospital brings suit against a hospital service corporation that refused to renew a contract with plaintiff; at most, plaintiff could show a partial diminution in business).

█ The logic underlying this distinction between total and partial exclusions is apparent. Put quite simply, it is obvious that a total exclusion is more likely substantially and adversely to affect interstate commerce than a partial exclusion. Thus, analysis of the nature of the alleged restraint in each case will have a significant bearing on both the substantiality and nexus requirements of the tripartite jurisdictional test.

### b. Nature of the plaintiff

The third and final element in this framework for analyzing federal court jurisdiction over denial of hospital staff privileges cases involves the nature of the specific plaintiff in each case. Judges sustaining their Sherman Act jurisdiction have been able to rely not only on the more exclusive restraints discussed above, but also have decided cases brought by large institutional plaintiffs or individual physician plaintiffs with hospital-based practices that would be particularly foreclosed by defendants' conduct. On the other hand, judges that have been unwilling to sustain their antitrust jurisdiction have relied not only on the pleading of less restrictive exclusions, but also have decided cases brought by individual physician plaintiffs whose practice is primarily independent of the defendant hospital or association.

Many of the cases in which federal courts have sustained their own antitrust jurisdiction have involved large institutional plain-tiffs (such as a hospital or clinic) or have involved class-based claims asserted for the benefit of large numbers of physicians. *Hospital Building Co. v. Trustees of the Rex Hospital, supra* (large hospital's expansion plans blocked); *Hahn v. Oregon Physicians' Service and Physicians' Association of Clackamus County, supra* (although not pleaded formally as a class action, complaint alleges denial to all podiatrists); *Feminist Women's Health Center, Inc. v. Mohammad, supra,* (clinic asserted tortious interference with contractual relations); *Ballard v. Blue Shield of Southern West Virginia, Inc., supra,* (class action on behalf of chiropractors); *Doctors, Inc. v. Blue Cross of Greater Philadelphia, supra,* (effectively, a class action on behalf of all Philadelphia hospitals); *Feldman v. Jackson Memorial Hospital, supra* (although not pleaded formally as a class action, complaint alleges denial to all podiatrists).

All of the remaining cases in which federal courts have found Sherman Act jurisdiction involve individual doctors, or small groups of doctors, who have a primarily *hospital-based* medical practice.[12] *Mishler v. St. Anthony's Hospital Systems, supra* (neurosurgeon); *Crane v. Intermountain Health Care, Inc., supra* (pathologist); *Everhart v. Jane C. Stormont Hospital and Training School for Nurses, supra* (cardiovascular surgeon); *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center, supra* (anesthesiologists); *Malini v. Singleton & Associates, supra* (radiologist); *Hyde v. Jefferson Parish Hospital District, No. 2, supra* (anesthesiologist); *Robinson v. Magovern, supra* (cardio-thoracic surgeon).

On the other side of the jurisdictional coin, every court that has declined to exercise antitrust jurisdiction has been confronted with single or small-group physician plaintiffs; indeed, many physician plaintiffs in the non-jurisdiction cases have

---

12. Only the Eastern District of Michigan's decisions in *Zamiri v. William Beaumont Hospital, supra,* and *Stone v. William Beaumont Hospital, supra,* can be viewed as falling outside this statement. In *Zamiri,* the court failed to identi-fy specifically the field of practice engaged in by the plaintiff physician. And in *Stone,* the plaintiff was a cardiologist seeking the same kind of privileges sought by plaintiffs in this case.

primarily non-hospital-based practices.[13] *Wolf v. Jane Phillips Episcopal-Memorial Medical Center, supra* (osteopathic physician); *Elizabeth Hospital, Inc. v. Richardson, supra* (physician chief-of-staff of plaintiff hospital denied privileges at separate hospital); *Riggall v. Washington County Medical Society, supra* (physician chief-of-staff of hospital denied medical society membership); *Nara v. American Dental Association, supra* (single dentist); *Barr v. National Right to Life Committee, Inc., supra* (obstetrician); *Grigg v. Blue Cross and Blue Shield of Michigan, supra* (two ear and throat doctors); *Daley v. St. Agnes Hospital, Inc., supra* (director of nursing); *Moles v. Morton F. Plant Hospital, Inc., supra* (two local physicians); *Capili v. Shott, supra* (one anesthesiologist); *Sokol v. University Hospital, Inc., supra* (one cardiac surgeon); *Harron v. United Hospital Center, Inc., supra* (one radiologist).

■ The logical underpinnings of this final consideration are also apparent. For example, restraints applied against major business entities in the health-care industry (such as entire hospitals or classes of physicians) are obviously more likely to affect interstate commerce more substantially and adversely than restraints applied against single doctors. Further, and specific to the denial of hospital staff privileges genre of cases, a hospital's exclusion of a physician whose entire practice is based at a hospital is far more likely to affect interstate commerce because the denial is more likely to result in a total foreclosure than that same hospital's exclusion of a doctor whose primary practice is not hospital-based. Thus, as with the nature of the alleged restraint component of this framework, the nature of the specific plaintiff in each case should, as a matter of practical economics, influence a court's determination on both the substantiality and nexus requirements of the tripartite jurisdictional test.

### III. Application of Legal Standards to Plaintiffs' Sherman Act Allegations

#### A. Introductory Statement

It is against this legal background that I must determine whether defendants are entitled to a dismissal of plaintiffs' amended complaint or whether plaintiffs have now pleaded sufficient factual allegations to support jurisdiction under the Sherman Act. As has been made abundantly clear by the excellent briefs prepared by both sides throughout this litigation, by the initial opinion in this case, and by the statement of legal standards just completed, plaintiffs' allegations that defendants' conduct violates the antitrust laws raise exceedingly complex jurisdictional issues under the Sherman Act. Before proceeding to an analysis of the sufficiency of plaintiffs' interstate commerce allegations—the only allegations at issue at this point in these proceedings—it is essential to reiterate the fairly simple factual underpinnings of the instant case.

The four individual plaintiffs in this case are the sole shareholders and physician-employees of the corporate plaintiff, Cardio-Medical Associates, Ltd. *See* Amended Complaint ¶¶ 4–8. The offices of all four of these local physician-plaintiffs are "located within the buildings housing defendant CCMC." *Id.* at ¶ 37. All four individual physician plaintiffs currently enjoy staff privileges at CCMC and, in fact, admit patients to that hospital. Transcript of Oral Argument on Defendants' Motion to Dismiss, at 5 (July 29, 1982). Indeed, except for the individual plaintiff Cass, who practices only internal medicine, the remaining individual plaintiffs are actively engaged in the practice of cardiology within the Cardiology Department at CCMC. *Id.* Thus, plaintiffs allege merely that the denial to them of the opportunity to perform certain specialized cardiology procedures at CCMC is the result of an unlawful conspiracy on

---

13. Only two of the decided cases in which antitrust jurisdiction was found to exist can be said to depart from this rule. *See Spears Free Clinic & Hospital for Poor Children v. Cleere, supra; Nankin Hospital v. Michigan Hospital Ser-vice, supra.* Both these cases can be viewed as aberrations and, in any event, have been rejected by the Third Circuit as resting "on flawed grounds even when [they were] issued." *Doctors, Inc.,* 490 F.2d at 52. *See id.* at 52 n. 5.

the part of defendants that has restrained trade in violation of sections 1 and 2 of the Sherman Act. *E.g.,* Amended Complaint ¶ 49.

The issue I must consider, therefore, is whether this limited denial of privileges to the individual physician-plaintiffs can, under any set of facts proved, substantially and adversely affect interstate commerce. My conclusion that no such effect is pleaded in plaintiffs' amended complaint is reached in three separate stages: (i) Plaintiffs' amended complaint does not satisfy the jurisdictional standards of the antitrust laws under the "in commerce" theory. (ii) Plaintiffs' amended complaint does not satisfy the tripartite jurisdictional standard of the antitrust laws under the "affecting commerce" theory. (iii) This decision is consistent with the vast majority of decided antitrust jurisdiction cases. Each of these is addressed below.

### B. "In Commerce" Theory

■ Plaintiffs apparently attempt to satisfy the interstate commerce requirement of the Sherman Act by alleging in their amended complaint that their activities are actually "in" interstate commerce.[14] The imagery of a "continuous and integrated stream of interstate commerce" is repeated throughout the paragraphs of plaintiffs' amended complaint in an effort to create the impression that plaintiffs' activities occur within the flow of interstate commerce.[15]

Plaintiffs' amended complaint alleges that both plaintiffs and defendants are engaged in the "provision of cardiology services ... to patients with cardiac or potential cardiac conditions." Amended Complaint ¶ 30. But the provision of such services is an activity that occurs entirely within the Commonwealth of Pennsylvania and is, therefore, wholly local in nature. As a matter both of precedent and inescapable logic, the provision of cardiology services cannot be considered an activity that occurs in interstate commerce. As a result, the "in commerce" theory of antitrust jurisdiction is inapplicable in the instant case.

It is well established that the provision of medical services is an intrastate transaction. The Seventh Circuit has held squarely that: "It is true that medical practice *per se,* and without more is a local activity. To bring it within the reach of the antitrust laws a substantial and adverse effect upon interstate commerce is required." *Williams v. St. Joseph Hospital,* 629 F.2d 448, 454 (7th Cir.1980). The excellently reasoned opinion by Chief Judge Young in *Moles v. Morton F. Plant Hospital, Inc.,* 1980–81 Trade Cas. (CCH) ¶ 63,600 (M.D.Fla.1978), *aff'd mem.* 617 F.2d 293 (5th Cir.1980), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 147 (1980), also emphasizes the intrastate nature of the practice of medicine in stating "[plaintiffs'] work involves practicing medicine and furnishing medical

---

**14.** Whether plaintiffs intend seriously to pursue this argument remains a mystery to me. Notwithstanding extensive briefing of this issue by defendants in their motion to dismiss, plaintiffs have never briefed the "in commerce" jurisdictional theory. Further, although plaintiffs' counsel stated at the outset of the oral argument on defendants' motion to dismiss that "[a]t the appropriate moment I will have something to say about that," Transcript of Oral Argument on Defendants' Motion to Dismiss, at 3 (July 29, 1982), no further mention of the "in commerce" jurisdictional theory occurred throughout his argument. Because under my view of the standards applicable to the "in commerce" jurisdictional theory, *see* part II. B.2. *supra,* plaintiffs' allegations are so clearly deficient, I have no problem in reaching this issue without the benefit of plaintiffs' legal thoughts.

**15.** For example, paragraph 3 of plaintiffs' amended complaint contains the following allegations:

Plaintiffs and defendants are all health care providers, or agents thereof, who operate within a continuous integrated stream of interstate commerce within the meaning of 15 U.S.C. §§ 1 and 2; plaintiffs are in the business of providing cardiology services to patients within a continuous and integrated stream of interstate commerce .... Defendants, similarly, operate within a continuous and integrated stream of interstate commerce in providing health care, including specifically cardiology services to patients ....

Amended Complaint ¶ 3. *See also id.* at ¶¶ 41, 42, 44, 46, 48.

services which is wholly intrastate." *Id.* at 77,189 (*citing Wolf v. Jane Phillips Episcopal-Memorial Medical Center,* 513 F.2d 684 (10th Cir.1975)). *Accord Riggall v. Washington County Medical Society,* 249 F.2d 266 (8th Cir.1957), *cert. denied,* 355 U.S. 954, 78 S.Ct. 540, 2 L.Ed.2d 530 (1958).

It is important to keep analytically distinct the "in commerce" and the "affecting commerce" theories of jurisdiction. Thus, plaintiffs cannot negate the essentially intrastate character of their business by identifying incidental ties with interstate commerce; such an approach is appropriate only under the "affecting commerce" theory of jurisdiction. For example, simply because plaintiffs might use equipment or drugs emanating from out-of-state in connection with the provision of cardiology services does not convert plaintiffs' activities to those that are "in commerce." *See St. Anthony-Minneapolis, Inc. v. Red Owl Stores, Inc.,* 316 F.Supp. 1045 (D.Minn.1970) (incidental flow of supplies in interstate commerce does not transform an essentially intrastate activity into an interstate enterprise). Further, plaintiffs' treatment of some patients who travel in interstate commerce in order to receive medical care does not transform plaintiffs' practice into an interstate enterprise. *See Elizabeth Hospital, Inc. v. Richardson,* 269 F.2d 167, 170 (8th Cir.) ("fact that some of plaintiff's patients might travel in interstate commerce does not alter the local character of plaintiff's hospital"), *cert. denied,* 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959); *Plum Tree, Inc. v. N.K. Winston Corp.,* 351 F.Supp. 80 (S.D.N.Y.1972) (in a case in which transaction is intrastate in character, the mere incidental flow of customers and supplies in interstate commerce does not

change that character). Finally, "in commerce" jurisdiction is not created by the allegation that plaintiffs' cardiology practice involves receipt of out-of-state payments. *See Dominion Parking Corporation v. Baltimore & Ohio Railway Co.,* 450 F.Supp. 441, 444–45 (E.D.Va.1978) ("passage of checks, reports, and documents from one state to another cannot transform ... a purely local business into an activity of interstate commerce.").

The provision of cardiology services also cannot be considered "an integral, essential and inseparable part of an interstate transaction." *Heille v. City of St. Paul, Minnesota,* 512 F.Supp. 810 at 813 (D.Minn.1981), *aff'd,* 671 F.2d 1134 (8th Cir.1982). In *Heille,* both plaintiff and defendant were in the business of collecting rubbish. The trial court rejected plaintiff's argument that rubbish collection was "in commerce" stating that the transaction in question "starts and ends with the pick-up and deposit of the rubbish." Id. at 813.[16] As in *Heille,* the performance of cardiology services by plaintiffs is a transaction that both begins and ends within a single state; it is, therefore, not "in commerce."

### C. "Affecting Commerce" Theory

As plaintiffs have failed to satisfy the "in commerce" theory of Sherman Act jurisdiction, their amended complaint must be dismissed unless it meets the tripartite "affecting commerce" jurisdictional test. *See* part II.B.2. *supra.* My holding that plaintiffs' amended complaint is fatally deficient in this regard as well is based on an analysis of each of the ten channels of interstate commerce identified in plaintiffs' complaint as being substantially and adversely affected by defendants' alleged illegal activities.[17]

---

**16.** The trial court in *Heille* also found that the collection of rubbish was not an integral part of an interstate transaction merely because plaintiff purchased refuse trucks and other equipment from out-of-state. *Heille,* at 813. *See also United States v. American Building Maintenance Industries,* 422 U.S. 271, 285, 95 S.Ct. 2150, 2158, 45 L.Ed.2d 177 (1975) (merely because equipment used by defendant was manufactured out-of-state did not place defendant's activities "in commerce" because defendant did

not participate directly in the sale, purchase, or distribution of goods or services in interstate commerce).

**17.** Although I recognize that Sherman Act jurisdiction may be established through a "combination of factors," *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center,* 536 F.Supp. 1065, 1082 (E.D.Pa.1982), and that the precedents require that interstate commerce allegations be viewed as a whole, *e.g., Hospital*

The following analysis demonstrates conclusively that, for each channel, plaintiff has failed to allege sufficient facts on at least one of the required jurisdictional elements.[18]

### 1. Treatment of Out-of-State Patients by Plaintiffs

■ Paragraphs 37 and 38 of plaintiffs' amended complaint contain allegations to the effect that plaintiffs treat patients who travel in interstate commerce.[19] Plaintiffs argue that these allegations identify a relevant channel of interstate commerce and that defendants' conduct has had a substantial and adverse effect on that channel because the total volume of patients serviced by plaintiffs, including those from out-of-state, would increase were it not for defendants' alleged antitrust violations.

As I held in the initial *Cardio-Medical* opinion, "allegations relating to the treatment of patients who [travel] in interstate commerce do not satisfy the interstate commerce requirement of the antitrust laws." *See Cardio-Medical*, 536 F.Supp. at 1081. Regardless of whether this holding is analyzed under the presence of interstate commerce or nexus prong of the tripartite jurisdictional test, my position remains precisely the same: "the treatment of patients who must 'travel in interstate commerce' does not constitute the practice of medicine in 'interstate commerce as the transportation of such patients is incidental.' " *Capili v. Shott*, No. 78–1009–B1, slip op. at 3 (S.D. W.Va. March 15, 1978), *aff'd*, 620 F.2d 438 (4th Cir.1980) (*quoting Riggall v. Washington County Medical Society*, 249 F.2d 266, 268 (10th Cir.1957), *cert. denied*, 355 U.S. 954, 78 S.Ct. 540, 2 L.Ed.2d 530 (1958)).

This holding has substantial support in a number of the decided health-care industry cases. *Wolf v. Jane Phillips Episcopal-Memorial Medical Center*, 513 F.2d 684 (10th Cir.1975); *Elizabeth Hospital, Inc. v. Richardson*, 269 F.2d 167 (8th Cir.), *cert. denied*, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959); *Riggall v. Washington County Medical Society, supra; Spears Free Clinic and Hospital for Poor Children v. Cleere*, 197 F.2d 125 (10th Cir.1952); *Nara v. American Dental Ass'n*, 526 F.Supp. 452 (W.D. Mich.1981); *Barr v. National Right to Life*

*Building Co. v. Trustees of the Rex Hospital*, 425 U.S. 738, 744, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976), because I conclude that no single channel of interstate commerce identified by plaintiffs' amended complaint satisfies all parts of the tripartite jurisdictional test, I feel confident in holding that the "affecting commerce" jurisdictional theory has not been met.

**18.** To satisfy the "affecting commerce" test, plaintiffs' amended complaint must contain factual allegations that, if proved, would sustain each of three independent underlying findings: the presence of a relevant channel of interstate commerce, the existence of a substantial and adverse effect on interstate commerce, and the requisite nexus between the challenged activities of defendants and the effect on the relevant channel of interstate commerce. *See* part II.B.2. *supra.* Further, "[f]ailure to allege sufficient facts on any one of these jurisdictional prerequisites requires dismissal of plaintiffs' complaint." *Cardio-Medical*, 536 F.Supp. at 1074.

**19.** 37. ... Approximately 12–15% of the patients served by plaintiff Cardio-Medical Associates, Ltd., and the plaintiff doctors associated with Cardio-Medical Associates, are from the states of New Jersey, Delaware, or states other than Pennsylvania. These patients account for in excess of $100,000.00 of annual revenues to plaintiff Cardio-Medical Associates, Ltd. (hereinafter "Cardio-Medical"). Upon information and belief and based upon plaintiffs' cross-section of patients, at least 12–15% of the hundreds of thousands of dollars of revenues foreclosed to plaintiffs by defendants' unlawful activities would have been for cardiology services rendered to such patients from other states.
38. Both plaintiffs and defendants primarily service cardiac patients within a radius of 8–10 miles of the CCMC facility. This radius includes significant portions within the states of New Jersey and Delaware ....
Amended Complaint ¶¶ 37, 38.
Paragraph 38 also alleges that defendants treat patients who travel in interstate commerce. I have already held that the extent of defendants' activities in interstate commerce is irrelevant in establishing jurisdiction under the Sherman Act in denial of hospital staff privileges cases. *See Cardio-Medical*, 536 F.Supp. at 1076–78; note 22 *infra.* But I also note that the analysis that follows applies with equal force to both plaintiffs' and defendants' patients.

*Committee,* 1981–2 Trade Cas. (CCH) ¶ 64,-315 (M.D.Fla.1981); *Daley v. St. Agnes Hospital, Inc.,* 490 F.Supp. 1309 (E.D.Pa. 1980); *Capili v. Shott, supra;* ¶ 63,443 (E.D. Pa.1980); *Capili v. Shott, supra; Nankin Hospital v. Michigan Hospital Service,* 361 F.Supp. 1199 (E.D.Mich.1973). *See Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (interstate travel of patients pleaded in complaint but not mentioned by Supreme Court); *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48 (3d Cir.1973) (district court judge held that interstate travel of patients did not satisfy the jurisdictional requirement of the Sherman Act; court of appeals did not reach the issue).

Concededly, an equally impressive array of courts have reached the opposite conclusion. *Hahn v. Oregon Physicians' Service & Physicians' Association of Clackamus County,* 1982–2 Trade Cas. (CCH) ¶ 64,970 (9th Cir.1982), *rev'g,* 1981–1 Trade Cas. (CCH) ¶ 63,923 (D.Or.1981); *Mishler v. St. Anthony's Hospital Systems,* 1981–2 Trade Cas. (CCH) ¶ 64,342 (10th Cir.1981); *Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715 (10th Cir.1980) *(en banc); Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530 (5th Cir.1978), *cert. denied sub nom. Palmer v. Feminist Women's Health Center, Inc.,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979); *Everhart v. Jane C. Stormont Hospital,* 1982–1 Trade Cas. (CCH) ¶ 64,703 (D.Kan.1982); *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center,* 1982–1 Trade Cas. (CCH) ¶ 64,498 (N.D.Ill. 1981); *Robinson v. Magovern,* 521 F.Supp. 842 (W.D.Pa.1981), *aff'd,* 688 F.2d 824 (3d Cir.1982); *Malini v. Singleton & Associates,* 516 F.Supp. 440 (S.D.Tex.1981); *Feldman v. Jackson Memorial Hospital,* 509 F.Supp. 815 (S.D.Fla.1981); *Hyde v. Jefferson Parish Hospital District, No. 2,* 513 F.Supp. 532

(E.D.La.1981), *rev'd on other grounds,* 686 F.2d 286 (5th Cir.1982); *Stone v. William Beaumont Hospital,* No. 79–74212 (E.D. Mich. Aug. 17, 1981).

Unfortunately, very few of the above-cited cases contain any analysis in support of their holdings; rather, the conclusions of the courts tend to be expressed in conclusory terms. Indeed, the *Barr* case is the only opinion in which any reference is made to the particular facts involved in the decided cases. *See Barr,* 1981–2 Trade Cas. (CCH) at 74,409 ("plaintiff does not assert that his patients are crossing state lines with the purpose of availing themselves of his services, but rather that a number of them happen to be in Florida for vacation or business purposes"). I decline to follow the lead of the remainder of the above-cited cases by merely expressing my holding in conclusory terms.

First, on the facts of this case, plaintiffs have not pleaded sufficient factual allegations to demonstrate a nexus between the denial to them of the right to use specialized cardiology procedures and any substantial effect on the interstate travel of patients. These plaintiffs already have staff privileges at CCMC and, indeed, already maintain offices on the premises of CCMC. It is logically inconceivable that granting the individual plaintiffs the right to perform certain additional specialized procedures will have any discernible impact on the travel of their patients in interstate commerce. This is not merely a shifting argument; it is a statement of logic based on my conviction that patients do not choose cardiologists because they either can, or cannot, perform services that the patient cannot even pronounce.[20] Thus, even assuming (which I do not) that travel of patients is a relevant channel of interstate commerce, on the facts of this case, as

---

**20.** Also significant in this regard are plaintiffs' allegations in their amended complaint as to how their patients who require the specialized services that plaintiffs cannot perform are treated under the status quo. It is conceded on numerous occasions that plaintiffs are required simply to refer their patients to other doctors for additional treatment. *E.g.,* Amended Complaint ¶¶ 41, 46(d), 51. Taking these factual allegations as true, it is obvious that plaintiffs' patients will travel precisely the same amount in interstate commerce whether plaintiffs or some other doctors are performing the specialized cardiology procedures currently denied to plaintiffs.

pleaded in plaintiffs' amended complaint, there is no logical nexus between the alleged restraint and the identified channel of commerce.

Second, it is my view that the travel of patients in interstate commerce is so remote from and incidental to the provision of medical care that it will almost never be a relevant channel of interstate commerce in denial of hospital staff privileges cases. A simple analogy might help to illuminate this position. Let us assume that the plaintiff in another antitrust case is a house painter who performs all of his services in Ocean City, New Jersey. The defendant, a large painting contracting firm that is allegedly seeking to monopolize the house-painting market in Ocean County, moves to dismiss plaintiff's Sherman Act complaint for lack of federal court jurisdiction. Plaintiff replies that a substantial percentage of the houses he paints are owned by people who live in New York, Pennsylvania, and Delaware, and who, therefore, must travel in interstate commerce in order to get to their summer homes.

Obviously, our hypothetical plaintiff's argument must be rejected. The travel of his customers in interstate commerce is simply too remote from his business or trade to vest a federal court with jurisdiction; his customers' travel in interstate commerce is wholly incidental to his painting of their houses. Plaintiffs in this case, like the plaintiff in *Barr*, do not assert that their patients travel in interstate commerce for the purpose of securing medical care from plaintiffs. Because the typical patient at most travels in interstate commerce to get to a particular hospital, as opposed to a particular doctor, in a standard denial of hospital staff privileges claim, the travel of patients in interstate commerce is so remote from and incidental to the provision of medical services that it is insufficient to vest a federal court with jurisdiction.[21]

This analysis is inconsistent with the analysis of the Tenth Circuit in *Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715 (10th Cir.1981) *(en banc).* In a footnote, the court of appeals appeared to conclude that *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), eliminated any doubt that "an interstate flow of people seeking a purely local service can have a substantial effect on interstate commerce." *Crane,* 637 F.2d at 726 n. 4. In *McLain,* the Supreme Court observed in passing, but did not hold, that on remand the plaintiffs might be able to "establish that, apart from the commerce in title insurance and real estate financing, an appreciable amount of interstate commerce is involved with the local residential real estate market arising out of the interstate movement of people." *McLain,* 444 U.S. at 245, 100 S.Ct. at 510. *See also Mortensen v. First Federal Savings and Loan Ass'n,* 549 F.2d 884, 887–88 (3d Cir.1977) (Third Circuit identifies out-of-state real estate purchasers as one of "several interstate contacts").

Although I have no quibble with the Supreme Court's position in *McLain* or with the Third Circuit's holding in *Mortensen,* I must disagree with the unreasoned and unwarranted extensions of those two holdings undertaken by the Tenth Circuit in *Crane.* It is most certainly not the law that any antitrust plaintiff who can identify some interstate movement of people, no matter how remote the connection with the alleged antitrust violation, satisfies federal jurisdictional requirements. Unlike the health-care industry, and unlike our hypothetical local house painter, there is a logical nexus between the interstate travel of people and purchases of residential real estate—as a direct result of people moving in interstate

---

**21.** In certain extraordinary cases, however, patients might travel in interstate commerce for the purpose of securing medical care. For example, if Dr. Christian Barnard were denied staff privileges in an Arizona hospital, he might well be able to argue, as a result of his preeminence in the heart-transplant field, that the travel of his patients in interstate commerce is not incidental to or remote from his practice of medicine. But cases in which patient travel in interstate commerce is directly and substantially related to the practice of medicine are likely to be few and far between. And nothing in plaintiffs' amended complaint even suggests that these plaintiffs can fit within this limited exception.

commerce residential real estate will be bought and sold. The logical connection between patient travel in interstate commerce and the receipt of medical services is so remote and incidental that any extension of the *McLain* and *Mortensen* residential real estate holdings to the health-care industry is wholly unwarranted.

### 2. Interstate Flow of Revenues to Plaintiffs

■ Paragraphs 41, 44, and 45 of plaintiffs' amended complaint allege that several hundred thousand dollars in annual revenues flow in interstate channels to plaintiffs from out-of-state private insurers and the federal government. In addition, plaintiffs allege in these same paragraphs that defendants' activities have foreclosed substantial additional revenues in this channel of interstate commerce.[22]

Although the interstate flow of revenues argument appears to be plaintiffs' strongest point on the facts of this case, I hold, as I did in the initial opinion on this case, "that such allegations are insufficient to sustain the jurisdiction of a federal trial court." *Cardio-Medical,* 536 F.Supp. at 1081–82 n. 19. This position is consistent with the

---

**22.** 41. Foreclosure of plaintiffs from certain highly specialized cardiac procedures and cardiology services has resulted in substantial foreclosure of fees to plaintiffs. In the cardiac catheterization lab alone, plaintiffs conservatively estimate that they have been foreclosed in recent years from at least $70,000 in fees annually, for services performed *upon their own patients,* and from approximately $200,000 in fees within the four-year statute of limitations period. . . . Plaintiffs conservatively estimate that they have been foreclosed from approximately $250,000 in fees for cardiology services other than cardiac catheterization during the past four years.

44. In addition, the financing of plaintiffs' business, including the payment for cardiology services rendered by plaintiffs and the investments of the plaintiff Cardio-Medical's revenues and profits, involves a continuous and unbroken stream of interstate commerce. Virtually all of Cardio-Medical's patients are covered by some kind of "third-party billing" procedure, wherein a private medical insurer or a public entity pays for a large part or all of the procedures, services and medications administered to patients by plaintiff Cardio-Medical and its doctors. Most of the third-party insurers paying claims are located out of the Commonwealth of Pennsylvania, with the exception of Blue Shield of Pennsylvania. In addition, plaintiffs' out-of-state patients are covered generally by either Blue Shield of Delaware or Blue Shield of New Jersey. In addition, Federal Medicare funds sourced from Washington, D.C. in a continuous stream of interstate commerce, constitute approximately 50–60% of the gross revenue of plaintiff Cardio-Medical, and is also sourced in interstate commerce. Accordingly, Medicare covers at least several hundred thousand dollars per year of Cardio-Medical's fees, in a continuous, integrated, unbroken stream of interstate commerce. A large portion of Medicaid reimbursements, which also cover much of plaintiffs' fee charges, also originates in Washington, D.C. or other states. Many of the private carriers paying for the services rendered to plaintiffs' patients are located out of state; *e.g.,* Prudential in Newark, New Jersey, and Aetna in Hartford, Connecticut. Defendants' activities have affected these revenues in interstate commerce and foreclosed substantial additional revenues in interstate commerce.

45. . . . [S]ubstantial additional revenues in amounts to be determined during discovery have been foreclosed and affected in interstate commerce because defendants have monopolized virtually all cardiology services for all CCMC patients including most such services for patients of plaintiffs. . . . Plaintiffs' revenues are threatened with future foreclosures aggregating hundreds of thousands or millions of dollars. Amended Complaint ¶¶ 41, 44, 45.

Plaintiffs also allege that the bulk of defendants' revenues is derived from interstate commerce. *See* Amended Complaint ¶ 45. The extent of defendants' activities in interstate commerce, however, is irrelevant in establishing jurisdiction under the Sherman Act in denial of hospital staff privileges cases. *See Cardio-Medical,* 536 F.Supp. at 1076–78. I continue to adhere to this view even after the Ninth Circuit's conclusory holding in *Hahn* last month. That opinion is distinguishable from the instant case first, because it is a Ninth Circuit opinion applying the overbroad interpretation of *McLain* criticized above, *see* note 6 *supra,* and second, because it is not a denial of hospital staff privileges case. My holding is not that antitrust defendants' activities are irrelevant in assessing a federal court's jurisdiction, but rather that in denial of hospital staff privileges cases, because of the typical factual underpinnings of such cases, the defendants' activities are not relevant.

In any event, the analysis that follows applies with equal force to both plaintiffs' and defendants' revenues.

result reached in a number of other denial of hospital staff privileges cases. *Barr v. National Right to Life Committee, Inc., supra; Moles v. Morton F. Plant Hospital, Inc., supra; Capili v. Shott, supra.* See *Feminist Women's Health Center v. Mohammad, supra* (district court held that interstate flow of revenues did not vest federal court with jurisdiction; court of appeals did not reach issue); *Doctors, Inc. v. Blue Cross of Greater Philadelphia, supra* (district court held that interstate flow of revenues did not vest federal court with jurisdiction; court of appeals did not reach issue). Concededly, however, the majority of cases considering this issue have reached the opposite conclusion. *Hospital Building Co. v. Trustees of the Rex Hospital, supra; Hahn v. Oregon Physicians' Service & Physicians' Association of Clackamas County, supra; Mishler v. St. Anthony's Hospital Systems, supra; Crane v. Intermountain Health Care, Inc., supra; Ballard v. Blue Shield of Southern West Virginia, Inc.,* 543 F.2d 1075 (4th Cir.1976), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977); *Everhart v. Jane C. Stormont Hospital & Training School for Nurses, supra; Dos Santos v. Columbus-Cuneo-Cabrini Medical Center, supra; Malini v. Singleton & Associates, supra; Feldman v. Jackson Memorial Hospital, supra; Hyde v. Jefferson Parish Hospital District No. 2, supra; Stone v. William Beaumont Hospital, supra; Robinson v. Magovern,* 456 F.Supp. 1000 (W.D.Pa.1978); *Zamiri v. William Beaumont Hospital,* 430 F.Supp. 875 (E.D.Mich. 1977).

Again, it is unfortunate that, in most of the above-cited cases, no analysis is supplied to support the individual court's conclusions.[23] I remain both unsatisfied and frustrated with mere conclusory holdings on complex jurisdictional issues and therefore offer the following analysis in support of my position.

First, the relationships between the third-party payors and the actual provision of medical services from doctor to patient appear to me to be too remote and incidental to sustain the limited jurisdiction of a federal trial court.[24] Chief Judge Young of the Middle District of Florida has expressed this position eloquently:

Although plaintiffs' interstate commerce allegations are set forth at length in the complaint, they all center upon one fact. Many patients' bills are paid by insurance companies or by the federal government. Funds for the payment of these bills necessarily travel in interstate commerce. Plaintiffs allege that the amount of funds received by them from the federal government and interstate insurance carriers is dependent upon plaintiffs' access to hospital facilities.

It is plaintiffs' patients who are responsible for the payment of plaintiffs' fees however. These fees are incurred for services performed intrastate. The patients are local residents. There has been no allegation that defendants have caused any increase (or decrease) in fees charged thereby causing a change in the flow of insurance benefits flowing in interstate commerce from the federal government and/or insurance carriers to the ultimate beneficiaries.

Defendants' actions have not been alleged to affect plaintiffs' relationships with the insurance carriers or the federal government. Nor have defendants' actions affected plaintiffs' patients' relationships with their insurers. It is not alleged that the patients will purchase any less insurance as a result of defendants' actions. Plaintiffs still are entitled to be paid just the same for the work they do. The amount of work plaintiffs

---

**23.** The decision of Chief Judge Young in the *Moles* case is a notable exception to this statement. That decision is discussed in the next paragraph.

**24.** Again, as with the interstate travel of patients, it is irrelevant whether this remoteness argument is classified under the relevant chan-

nel of interstate commerce or nexus prong of the tripartite "affecting commerce" jurisdictional standard. The effect of a holding that the interstate flow of revenues is too incidental to vest a federal court with jurisdiction is the same regardless of the particular test under which it is analyzed.

do may be reduced as a result of defendants' actions, but this work involves practicing medicine and furnishing medical services which is wholly intrastate.

*Moles,* 1980–81 Trade Cas. (CCH) at 77,189

The same conclusion can be illuminated by further reference to our hypothetical painter. Suppose that, in addition to the facts stated earlier, our plaintiff house painter was called on to paint a large number of houses in Ocean City as a result of a flood that destroyed or damaged a number of his clients' dwellings. Payment for these services came from one of three sources: (i) out-of-state insurance companies; (ii) the federal government's flood relief program; or (iii) personal checks drawn on either New Jersey, New York, Pennsylvania, or Delaware banks. Obviously, the local house painter is no closer to stating federal jurisdiction now than he was before these facts were added to the hypothetical. The economic reality of the situation is that his clients remain primarily liable for the cost of the house painting. The house painting, however, remains a purely local activity and cannot be transformed into one "affecting interstate commerce" simply because of the incidental and fortuitous result that the plaintiff receives some payments from out-of-state.[25]

Second, and independent from the above argument, plaintiffs' allegations regarding interstate flow of revenues are legally deficient because of the shifting argument discussed extensively in part II.B.2. *supra.*[26] *See Exxon Corp. v. Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Cartrade, Inc. v. Ford Dealers Advertising Ass'n of Southern California,* 446 F.2d 289 (9th Cir.1971), *cert. denied,* 405 U.S. 997, 92 S.Ct. 1249, 31 L.Ed.2d 465 (1972); *Dominion Parking Corp. v. Baltimore and Ohio Railway Co.,* 450 F.Supp. 441 (E.D.Va.1978); *Moles v. Morton F. Plant Hospital, Inc., supra.*

Plaintiffs' contention that, because they have been prevented from performing the specialized cardiology procedures at CCMC, they have been foreclosed from earning additional revenues is legally insufficient to vest this court with jurisdiction. As stated by the court in *Moles:* "Here all the allegations regard a diminution of interstate insurance payments to plaintiffs, *but the flow in interstate commerce would be the same.* The effect of the defendants' actions would be on the plaintiffs, but not on the flow of interstate commerce." *Moles,* 1980–81 Trade Cas. (CCH) at 77,189 (emphasis supplied). *Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (the antitrust laws are intended to protect competition, not individual competitors); *Sausalito Pharmacy, Inc. v. Blue Shield of California,* 544 F.Supp. 230 at 235 (M.D.Cal.1981) ("the failure to make more money . . . is simply not the kind of problem which the antitrust laws address").

### 3. Use of Medical Equipment and Medical Supplies by Plaintiffs

■ Paragraphs 39, 40, 41 and 43 of plaintiffs' amended complaint allege that both plaintiffs and defendants[27] use medical equipment and supplies originating largely from out-of-state, that defendants'

---

**25.** Extending plaintiffs' argument to its logical limits illustrates the propriety of my holding. If plaintiffs' patients paid all their bills by themselves, without any assistance from third-party payors, plaintiffs might still argue that there was a flow of funds in interstate commerce as a result of the economic reality that all money is "sourced" in interstate commerce. *See* Amended Complaint ¶ 44. It is simply inconceivable that, in any business involving exchange of money for services, or insurance payments, Sherman Act jurisdiction exists.

**26.** As noted above, the shifting argument has relevance under both the substantiality and nexus prongs of the tripartite "affecting commerce" jurisdictional test. It is also important to reiterate that shifting is a sufficient, but not necessary argument for dismissal of plaintiffs' amended complaint.

**27.** Again, the use of equipment by defendants is irrelevant for purposes of this jurisdictional inquiry. *See Cardio-Medical,* 536 F.Supp. at 1076–78; note 22 *supra.* In any event, the analysis that follows applies with equal force to both plaintiffs' and defendants' use of equipment and supplies.

actions have foreclosed plaintiff's access to defendant CCMC's equipment, and that, as a result, the flow of medical equipment in interstate commerce has been reduced and affected by defendants' actions.[28]

The allegations regarding use of medical equipment and supplies contained in plaintiffs' amended complaint are insufficient as a matter of law to establish either a substantial and adverse effect on interstate commerce or a logical nexus. This conclusion is supported by a number of the previously decided antitrust jurisdiction cases in the health-care field. *Elizabeth Hospital, Inc. v. Richardson, supra; Spears Free Clinic and Hospital for Poor Children v. Cleere, supra; Nara v. American Dental Ass'n, supra; Barr v. National Right to Life Committee, Inc., supra; Daley v. St. Agnes Hospital, Inc., supra; Nankin Hospital v. Michigan Hospital Service, supra.* Once more, an equally impressive number of the previously decided cases have reached a contrary conclusion. *Hospital Building Co. v. Trustees of the Rex Hospital, supra; Hahn v. Oregon Physicians' Service and Physicians' Associa-* tion *of Clackamas County, supra; Mishler v. St. Anthony's Hospital Systems, supra; Crane v. Intermountain Health Care, Inc., supra; Williams v. St. Joseph Hospital,* 629 F.2d 448 (7th Cir.1980); *Feminist Women's Health Center, Inc. v. Mohammad, supra; Ballard v. Blue Shield of Southern West Virginia, Inc., supra; Doctors, Inc. v. Blue Cross of Greater Philadelphia, supra; Everhart v. Jane C. Stormont Hospital and Training School for Nurses, supra; Dos Santos v. Columbus-Cuneo-Cabrini Medical Center, supra; Malini v. Singleton & Associates, supra; Feldman v. Jackson Memorial Hospital, supra; Hyde v. Jefferson Parish Hospital District No. 2, supra; Stone v. William Beaumont Hospital, supra; Robinson v. Magovern, supra.*[29]

The now familiar lack of analysis by courts in the above-cited decisions is particularly frustrating in the context of the equipment and supply channel of interstate commerce. In this context, perhaps more than with any other channel, a federal court's holding on its jurisdiction must be

28. 39. Plaintiffs' equipment used in their practice of cardiology and internal medicine largely originates from out-of-state, and aggregates approximately $50,000 in value or cost. The equipment used by defendant Cardiology Associates aggregates substantially more in value or cost, but its precise value or cost is unknown to plaintiffs prior to discovery in this lawsuit. This equipment also originates largely from out-of-state. The violations alleged herein have affected the use of such equipment by both plaintiffs and defendants.

40. Defendant CCMC has a great deal of specialized and highly sophisticated equipment which is used in the treatment of cardiac patients. This equipment exceeds, upon information and belief, $2,000,000 in cost or value. The actions of the defendants herein have foreclosed plaintiffs from access to the use of much of this equipment in practicing their profession and providing cardiology services and treating cardiac patients, and have caused plaintiffs to suffer loss of access to the large bulk of this highly sophisticated equipment. The vast majority of this equipment emanates from outside the Commonwealth of Pennsylvania in interstate or foreign commerce, and the activities of the defendants have accordingly affected such interstate trade or commerce by causing such foreclosure of the plaintiffs.

41. ... These [cardiology] services are performed in a continuous stream of interstate commerce, because, *inter alia,* the equipment used in the cardiac catheterization laboratory largely emanates within the stream of interstate and foreign commerce ....

43. ... Such medications are sometimes administered using equipment which is shipped in interstate commerce, and defendants' activities have affected this commerce as well.
Amended Complaint ¶¶ 39, 40, 41, 43.

29. Both parties brought to the court's attention an analogous line of cases involving antitrust jurisdiction in the waste collection industry. Plaintiffs cite the Third Circuit decision in *J.P. Mascaro & Sons, Inc. v. William J. O'Hara, Inc.,* 565 F.2d 264 (3d Cir.1977), in which the court sustained federal interstate commerce jurisdiction based, in part, on plaintiff's allegation that it purchased from out-of-state some portion of its trucks and equipment used to haul rubbish. On the other hand, in the nearly identical factual case of *Heille v. The City of St. Paul, Minnesota,* 671 F.2d 1134 (8th Cir.1982), the Eighth Circuit held that "plaintiff failed to demonstrate the required nexus with interstate commerce." *Id.* at 1137.

guided exclusively by the well pleaded facts of the complaint in each case. *See* part *II. C.1. supra.* This principle is of particular significance on the facts of the instant case.

First, the allegations in plaintiffs' amended complaint refer solely to an alleged effect on the *use* of equipment and supplies by plaintiffs. It is highly significant that the amended complaint is completely devoid of any allegations of an alleged effect on the *purchase* of medical equipment or medical supplies by plaintiffs. There is no allegation that plaintiffs directly purchased any medical equipment or supplies from any out-of-state supplier. Nor is there any indication in plaintiffs' amended complaint as to when plaintiffs might have purchased such out-of-state equipment.[30] Obviously, the mere local use of already purchased equipment and supplies is an intrastate activity and has no effect on interstate commerce regardless of the original shipping point of the equipment and supplies.

Second, even assuming that defendants' equipment and supplies could be deemed a relevant area of inquiry for jurisdictional purposes, *but see* note 27 *supra,* plaintiffs' allegations that they have been foreclosed from access to defendants' equipment would not establish any effect on interstate commerce. As discussed earlier, *see* text following note 26 *supra,* any such impact would affect only plaintiffs, not interstate commerce, and, therefore, would be insufficient to establish jurisdiction under the Sherman Act. Of substantial significance in this regard is paragraph 52 of plaintiffs' amended complaint. It is alleged therein that "[f]acilities of defendant CCMC are adequate to accommodate both plaintiffs and defendants in performing the specified and enumerated cardiac procedures upon their own patients, as well as upon referral patients who are not originally patients of either defendant Cardiology Associates or plaintiff, Cardio-Medical." Taking that al-

legation as true, it becomes apparent that granting plaintiffs access to the CCMC equipment that they are presently foreclosed from using will have absolutely no effect on interstate commerce.

Third, plaintiffs' allegations relating to the use of out-of-state medical equipment and supplies in their own medical practice are also inadequate to meet the jurisdictional requirements under the Sherman Act. For example, plaintiffs allege nothing more than that "the violations alleged herein have affected *the use of* such equipment by . . . plaintiffs." Plaintiffs do not, however, specify the precise nature of the alleged effect on their equipment and supplies. As a matter of logic, it is difficult to understand how plaintiffs' inability to perform certain *in-patient* cardiology services at CCMC could have any effect on the use of plaintiffs' office equipment. The gravamen of plaintiffs' claims is that they have been denied the opportunity to use certain equipment maintained by CCMC. It defies logic to argue that, if granted the right to use that equipment, plaintiffs would then purchase that very same equipment for use in connection with their own practice. In any event, plaintiffs' amended complaint contains no factual allegations regarding any diminution or increase in their purchase of medical equipment and supplies as a result of defendants' alleged anticompetitive activities.

### 4. Use of Automobiles, Gasoline, and Other Equipment by Plaintiffs

In paragraph 46(b) of their amended complaint, plaintiffs allege that "[a]utomobiles, gasoline and other equipment and supplies routinely used in the conduct of a medical practice, which virtually all originate from out-of-state or in a continuous, unbroken integrated stream of interstate commerce, have been affected by defendants' boycott and foreclosures."[31] This al-

---

**30.** The significance of this deficiency is that the equipment may well have been purchased long before the challenged activities occurred. Indeed, defendants have properly pointed out that the complaint sets forth no time period

during which defendants' allegedly anticompetitive activities took place.

**31.** Although this identified channel of interstate commerce is closely related to the medical equipment and supplies channel just discussed,

legation is also inadequate to satisfy the interstate commerce requirement of the Sherman Act.

First, plaintiffs' use of equipment only indirectly related to their medical practice is so incidental and remote that it is insufficient to satisfy the stringent standards for federal court jurisdiction. Again, whether this type of analysis belongs within the identification of a relevant channel of interstate commerce or nexus prong of the "affecting commerce" jurisdictional test is not relevant as the result of the holding—dismissal of plaintiffs' amended complaint—is the same under either test. Further reference to our hypothetical local house painter illuminates this point. Just because our plaintiff painter drives a car every day to work, and just because that car was manufactured in Detroit, Michigan, does not transform his purely intrastate activities into a business affecting interstate commerce. Similarly, purely local doctors driving cars that were shipped across state lines and purchasing gasoline that has been shipped across state lines does not have the direct and substantial effect on interstate commerce required by the applicable precedents. Thus, any such alleged effects are too minimal, remote, and incidental to warrant invocation of federal court jurisdiction. *See, e.g., Lieberthal v. North Country Lanes, Inc.,* 332 F.2d 269 (2d Cir.1964); *Hotel Phillips, Inc. v. Journeymen, Barbers, etc.,* 195 F.Supp. 664, 666 (W.D.Mo.1961), *aff'd,* 301 F.2d 443 (8th Cir.1962).

Second, plaintiffs again allege only that they *use* this indirectly related equipment that was at some time purchased in interstate commerce. There is no allegation that plaintiffs directly purchased this equipment from an out-of-state supplier, nor do they allege when the equipment was purchased. Further, plaintiffs do not allege that their purchases of this indirectly related equipment and supplies have been diminished or increased as a result of defendants' activities.

Third, on the facts of this case, plaintiffs have failed to meet the substantiality and nexus requirements of the tripartite jurisdictional test. There is simply no allegation as to how the challenged denial of the right to practice specialized cardiology procedures affects interstate commerce in gasoline or automobiles. Significantly, plaintiffs admit in their amended complaint that their offices are on CCMC property. *See* Amended Complaint ¶¶ 4, 37. Thus, plaintiffs do not drive to the hospital; they walk. Further, there is no logical explanation as to why plaintiffs will use their automobiles more and therefore buy more gasoline should they be granted the right to perform these additional specialized procedures at CCMC.

### 5. Prescription of Drugs and Medicines by Plaintiffs

■ Plaintiffs allege in paragraphs 42 and 43 of their amended complaint that they, and defendants,[32] prescribe significant quantities of drugs and medications for their patients, and that defendants' allegedly anticompetitive actions have affected this channel of interstate commerce by diminishing its volume.[33] Plaintiffs' allega-

---

I treat it separately because of some slight differences in the analysis employed. Because of the lack of supporting discussion in the equipment and supplies cases, it is usually impossible to tell whether the allegations at issue involve only equipment used directly in the business or profession at issue or also involve equipment with a more ancillary relationship. Because the more typical case involves only the direct equipment, I do not re-cite all of the precedent in this subsection.

**32.** Defendants' activities in interstate commerce are of course irrelevant in any denial of hospital staff privileges case. *See Cardio-Medical,* 536 F.Supp. at 1076–78; note 22 *su-*

*pra.* But I also note that the analysis that follows applies with equal force to prescription of medications by either plaintiffs or defendants.

**33.** 42. Cardiology services and internal medicine also involve the use of a large number of drugs and medications for patients. At any given time, Cardio-Medical will have approximately 1,000 active, current patients requiring vast amounts of medication which is prescribed for such patients. Cardio-Medical's total patients approximate 2,900 and plaintiffs estimate that all its patients require in excess of $1,000,000 worth of drugs and medications annually. The vast bulk of this

tions regarding the prescription of drugs and medications fail to aver a substantial and adverse effect on interstate commerce. *See Elizabeth Hospital, Inc. v. Richardson, supra. But see Hospital Building Co. v. Trustees of the Rex Hospital, supra.*

Plaintiffs' major difficulty under the tripartite jurisdictional standard is with the nexus requirement. Plaintiffs have simply failed to allege any logical connection between the challenged denial to them of the right to perform certain specialized cardiology procedures in CCMC and their prescription of additional interstate drugs and medications in their private practice or for their hospitalized patients. For example, in paragraph 42 of their amended complaint, plaintiffs allege that their hospital in-patients at CCMC require approximately $150,000 a year in cardiac patient medications largely emanating from outside Pennsylvania. Yet there is no allegation, and indeed can be no allegation, as to how that $150,000 figure will be affected in any way by plaintiffs being permitted to perform additional specialized procedures. Plaintiffs have simply not asserted any re-

lationship between the contested denial and their prescription of drugs and medications.

Further, the shifting argument described earlier in this opinion is particularly devastating to plaintiffs' position on this identified channel of interstate commerce. The only effect cited by plaintiffs is that they have been foreclosed from an opportunity to prescribe additional medications for their own patients as well as for other patients. Although this foreclosure may affect the individual plaintiffs, it does not constitute an effect on interstate commerce. *See* text following note 26 *supra;* part II.C.2. *supra.* The same quantity of drugs and medications is obviously prescribed for patients requiring cardiology services, regardless of the identity of the treating physician. It is, therefore, immaterial whether drugs and medications are ordered by plaintiffs or by the members of Cardiology Associates. There is no effect on interstate commerce because the flow of commerce remains the same; the only change that might arguably occur is with respect to which party is prescribing the drugs and medications.[34]

---

medication emanates from without the Commonwealth of Pennsylvania, because the vast majority of major drug companies supplying such cardiac patient medications are located outside the Commonwealth of Pennsylvania. In addition, plaintiffs' hospital in-patients at CCMC require approximately $150,000 per year in cardiac patient medications, which again largely emanate from without the Commonwealth of Pennsylvania. Accordingly, the business of plaintiffs necessarily involves the prescribing of drugs and medications which are administered to their patients in a continuous, unbroken, integrated stream of interstate and foreign commerce, and the foreclosures effected by defendants have affected and greatly diminished such commerce from the levels it would have reached absent such foreclosures.

43. The foreclosures alleged by plaintiffs to have been illegally caused by defendants, and the group boycott by defendants, have caused plaintiffs to be foreclosed from an opportunity to prescribe additional medication for their patients and other patients from whom they have been foreclosed, all of which has affected interstate and foreign commerce....

Amended Complaint ¶¶ 42, 43.

**34.** One colloquy that occurred during the oral argument on defendants' motion to dismiss is quite illuminating in this regard:

THE COURT: Let me explore those patients, their drugs again. If you are foreclosed from using the equipment, your clients are foreclosed, then you say [your clients] would not be prescribing these medicines.

MR. BERGER: What we are saying, Your Honor, is that currently as conditions exist, recognizing the fact of the violation of antitrust laws, ... the plaintiffs are prescribing [an] ... estimated $1,000,000 annually.

THE COURT: To establish a violation are you saying they would be prescribing much more than that?

MR. BERGER: Yes, we would; that is true.

THE COURT: Now, meaning that some patients aren't getting drugs prescribed for them, that would be if you were allowed to use this equipment.

MR. BERGER: It would mean they are not getting prescriptions prescribed by our physician plaintiffs.

. . . .

THE COURT: Yes, well now, what happens to those patients? Are they dead?

MR. BERGER: No, we don't know ....

. . . .

In this connection, it is significant to note what plaintiffs have not alleged in their amended complaint. There are no allegations, for example, that the flow of drugs and medications into the Commonwealth of Pennsylvania is any less as a result of the defendants' actions. Nor is there any allegation that the flow of drugs and medications into Pennsylvania will be reduced or terminated at any time in the future. Further, plaintiffs have not alleged that they would order a greater number of procedures for their patients than they order under the status quo if they were permitted to perform the cardiology services at CCMC. Finally, there is no allegation that plaintiffs would prescribe more medications for their patients or for other patients than are presently being prescribed by plaintiffs, defendants, or other physicians.

Finally, and significantly, plaintiffs do not buy and resell drugs and medications regularly in their practice of medicine. At best, plaintiffs merely *prescribe* drugs and medications that are then purchased by their patients. Any alleged effect on the interstate commerce in drugs and medications would therefore be several steps removed from the plaintiffs' own activities. As a result, this identified channel of interstate commerce is also too remote and incidental to vest a federal court with jurisdiction.

### 6. Dissuasion of Out-of-State Physicians From Associating With Plaintiffs

■ Plaintiffs allege in paragraph 46(a) of their amended complaint that "[m]edical personnel educated out-of-state or originating from out-of-state, have been dissuaded from joining plaintiff Cardio-Medical's staff because of the group boycott and other violations and foreclosures mounted by the defendants herein." Even assuming that this allegation could be substantiated, it fails to satisfy any one of the three "affecting commerce" jurisdictional standards.

> THE COURT: That is only affecting the fees of the doctors, not affecting the interstate commerce.
> Transcript of Oral Argument on Defendants' Motion to Dismiss, at 48–50 (July 29, 1982).

Read in its best light, plaintiffs would appear to be alleging that some restraint has been placed on the market for medical personnel services. A similar argument was considered and emphatically rejected by then District, now Circuit, Judge Becker in *Daley v. St. Agnes Hospital, Inc., supra.* The plaintiff in *Daley,* a hospital nursing director, claimed that he was discharged and blacklisted because of his advocacy of the rights, privileges, and professional status of his nursing staff and alleged a violation of the Sherman Act. The trial court dismissed the antitrust claim on the grounds that plaintiff had not established any relationship between the alleged illegal activity and interstate commerce. Judge Becker explained that:

> [P]laintiff cannot argue that his inability to find employment in surrounding states provides that nexus with interstate commerce, for "the labor of a human being is not a commodity or article of commerce." 15 U.S.C. § 17. Thus even if plaintiff had proffered facts showing that restraints were placed upon the marketing of his services, and even if those restraints curtail competition among employees, he would not have established a combination or conspiracy in restraint of trade or commerce without some further evidence of anticompetitive effect other than with regard to labor.

*Daley,* at 1317. *See generally Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *Taterka v. Wisconsin Telephone Co.,* 394 F.Supp. 862 (E.D. Wis.1975), *aff'd mem.* 559 F.2d 1224 (7th Cir.1977), *cert. denied,* 434 U.S. 924, 98 S.Ct. 402, 54 L.Ed.2d 281 (1977).

Equally significant, I can apprehend no logical connection whatever between plaintiffs having only partial staff privileges at CCMC and the market for medical personnel services, even assuming that to be a relevant channel of interstate commerce.[35] Even assuming the existence of some remote logical connection that has escaped my

---

**35.** Plaintiffs have been of no help in explaining this logical nexus to the court. At the conclusion of the oral argument on defendants' motion to dismiss I requested counsel "to give me a factual statement of the nexus of exactly

attention, it is both illogical and incredible to assume that the effect on interstate commerce of denying four local physicians the right to perform several specialized cardiology procedures is anything but *de minimis.*

*7. Inflating of Fees for Cardiology Services*

■ In portions of paragraphs 46, 50, 51, 53, and 58 of their amended complaint, plaintiffs allege that, as a result of their inability to perform the specified procedures at CCMC, the fees charged for cardi-

ology services have been inflated. More specifically, plaintiffs allege that defendants' challenged activities have lessened price competition and resulted in "double-billing" of their patients.[36] Assuming, as I must, that plaintiffs could in fact substantiate these somewhat puzzling allegations, I hold that they are legally insufficient to establish jurisdiction under the Sherman Act.[37]

Initially, it should be noted that double-billing and inflation of fees are obviously

what it was that was done that affected what and how." Transcript of Oral Argument on Defendants' Motion to Dismiss, at 72 (July 29, 1982). This particular channel of interstate commerce, however, received no mention in plaintiffs' supplemental memorandum submitted August 5, 1982.

36. [46.] (c) Price competition which might ameliorate or lessen the fees charged the out-of-state government or private insurers has been foreclosed and lessened because of the defendants' boycott and foreclosures;

[46.] (d) Plaintiffs' patients have been "double-billed" by two groups of cardiologists because plaintiffs cannot treat their own patients for the foreclosed cardiology services, thus inflating patients' bills and accordingly inflating the fee reimbursements from out-of-state government agencies and interstate private insurers;

50. Defendants have, by exclusive contractual arrangements in unreasonable restraint of trade and by other combinations and/or conspiracies, chosen to confer an unlawful monopoly upon defendant Cardiology Associates for all of the above enumerated cardiac procedures, despite the fact that this group boycott, conspiracy and unreasonable restraint of trade, and conspiracy to monopolize, results in increased cost to the public, to cardiac patients, and to the governmental and private insurers paying the vast bulk of cardiac patients' bills.

51. In addition, the defendants' boycott and conspiracy has resulted in patients of Cardio-Medical being "double-billed," resulting in vastly increased costs, because certain of the procedures necessary for their treatment, which treatment is otherwise solely conducted by their cardiac physicians, the plaintiffs, are required to be performed by the defendants under the wrongful and improper procedures, foreclosures, and group boycott mounted by defendants. Defendants' treatment of the same patients treated by plaintiffs results in a squandering of medical talent, inflated fees and reimbursements and consequent injury to the public, all af-

fecting the above-described interstate trade and commerce.

53. The specified group boycott and exclusive contractual arrangements have been implemented despite the fact that authoritative governmental and other studies have demonstrated that such arrangements result in increased health care costs for the public and have no compensated pro-competitive or other benefits, in an era in which health care costs have persistently been among the most rapidly rising components of the consumer price index, a national problem with enormous effects upon interstate trade and commerce . . . .

58. The foregoing unreasonable restraint of trade is heightened in anticompetitive effects upon interstate trade and commerce in that the activities of the defendants foreclose all price competition and foreclose any market framework in which price competition could develop or be fostered.

Amended Complaint, ¶¶ 46(c)–(d), 50, 51, 53, 58.

37. Although three of the courts finding Sherman Act jurisdiction mentioned the price competition channel of interstate commerce, none of those opinions is of any assistance on the facts of this case. For example, in *Ballard v. Blue Shield of Southern West Virginia, Inc., supra,* the plaintiff class of chiropractors charged that the purpose and effect of the defendants' challenged activities was to eliminate the competition of chiropractors throughout West Virginia. The Fourth Circuit, however, held only that it was "possible that the alleged reduction or elimination of the chiropractors' business throughout the entire State of West Virginia may adversely affect interstate commerce." *Ballard,* 543 F.2d at 1078. It is unclear that the court was relying on the price competition channel of interstate commerce alleged in plaintiffs' complaint in reaching its holding. And, in any event, the crucial factual distinction that *Ballard* involved a statewide class of physicians while the instant case involves only four local physicians renders that

not channels of interstate commerce in and of themselves. Plaintiffs' allegations regarding these effects on interstate commerce are, therefore, premised on the assumption that the interstate flow of revenues constitutes a relevant channel of interstate commerce for Sherman Act jurisdictional purposes. I have consistently rejected that position. *See* part III.C.2. *supra; Cardio-Medical,* 536 F.Supp. at 1081 n. 19.

Second, with respect to plaintiffs' allegations on the alleged price competition effect of defendants' activities, it is exceedingly doubtful whether any price competition exists in the health-care market. This issue was addressed extensively by Judge Cohill in his lengthy opinion in *Robinson v. Magovern,* 521 F.Supp. 842 (W.D.Pa.1981), *aff'd,* 688 F.2d 824 (3d Cir.1982).[38] *Robinson* was an unsuccessful antitrust action brought by a physician-plaintiff who had been denied hospital staff privileges.

Judge Cohill noted in his opinion that: "The third-party payor system generally insulates the consumer-patient from price considerations; this sharply contrasts with the commercial world, in which price often is the determinative factor for the buyer.

When purchasing medical services, most consumer-patients look for a high quality of care rather than for a low price." *Id.* at 877. *Cf. SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1063 (3d Cir.) (recognizing that the demand for various antibiotics with overlapping capabilities are not sensitive to price), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). In this case, plaintiffs have alleged that "[v]irtually all of Cardio-Medical's patients are covered by some kind of 'third-party billing' procedure." Amended Complaint ¶ 44. Thus, it is unlikely that plaintiffs would be able to establish the existence of any price competition in the purchasing of cardiology services, let alone that defendants' activities had an effect on such competition.

Finally, plaintiffs have failed to allege the requisite nexus between the alleged denial by defendants of the right to perform certain specialized cardiology procedures at CCMC and the asserted effect on prices and competition. Plaintiffs have not contended that they would charge less for these services than does Cardiology Associates. Nor is there any logic supporting plaintiffs' contention that the defendants' activities have

decision meaningless in this context. *See also Dos Santos v. Columbus-Cuneo-Cabrini Medical Center, supra* (resting a finding of jurisdiction in part on allegations as to price and quality of anesthesiology services, but supplying no analysis for the conclusion and citing cases that are irrelevant to the holding); *Stone v. William Beaumont Hospital, supra* (finding of jurisdiction in a case in which plaintiff pleaded the price competition channel of commerce; court never discusses the issue).

**38.** Dr. Robinson originally filed his complaint in 1977. "Three years of extensive discovery followed, punctuated by a variety of motions to compel and motions for protective orders. The litigation culminated in a ten-week non-jury trial that included the testimony of fifty-two witnesses, extensive briefing, and arguments by counsel." *Robinson,* 521 F.Supp. at 848. Nearly nine months later the Third Circuit affirmed the district court decision ruling in favor of all defendants on all claims.

In their supplemental memorandum, plaintiffs have asked me to take notice of the recent report of the Health Care Financing Administration, an arm of the United States Department of Health and Human Services charged with the responsibility for administering the federal Medicare and Medicaid programs. According to that report, in 1981, national health care expenditures increased 15.1% over the last year. In 1981, healthcare expenditures totalled $287 billion, nearly ten percent of the gross national product. Expenditures for physicians' services totalled $54.8 billion. The rate of increase for health expenditures significantly exceeded the rate of increase from the gross national product in the overall inflation rate. *See* R. Pear, *1981 Spending For Health Care Is Up by 15.1%,* N.Y. Times, July 27, 1982, at A.1.

Having taken notice of the extraordinary increases in costs of providing health care in recent years, as requested by plaintiffs, I am puzzled as to which way these facts cut. Surely, some substantial component of the gross national product must be spent in litigating antitrust cases involving routine denials of hospital staff privileges to local physicians with, at best, only remote and incidental effects on interstate commerce. Although I admire Judge Cohill for his perseverance, I fail to see how more than four years of litigation at a cost to both parties and the judicial system of hundreds of thousands of dollars improves the efficient allocation of resources in the national economy.

resulted in the double-billing of patients for cardiology services. The only way in which plaintiffs' patients could be double-billed for cardiology services is if plaintiffs themselves are billing their own patients for services they do not perform.[39] As a result, the critical nexus does not exist between the alleged effect on prices and the challenged activity of defendants.

### 8. Diminished Interstate Investments in Plaintiffs' Pension Portfolio

 Paragraphs 44 and 46(h) of plaintiffs' amended complaint allege that defendants' allegedly anticompetitive activities have diminished the volume of revenues and investments of plaintiffs' pension portfolio, which is managed in Maryland.[40] Once more, plaintiffs' identification of this particular channel of interstate commerce is insufficient as a matter of law to meet the interstate commerce requirement of the Sherman Act. See Doctors, Inc. v. Blue Cross of Greater Philadelphia, supra (district court holds that the pension investments channel of interstate commerce is insufficient to sustain antitrust jurisdiction; issue not reached by court of appeals).

 As with a number of the other channels of interstate commerce identified by plaintiffs, the allegations regarding pension portfolio investments merely identify an effect on plaintiffs, and not an effect on interstate commerce. As discussed above, effects on competitors are inadequate to satisfy the interstate commerce requirement of the antitrust laws absent an allegation of effects on commerce. See text following note 26 supra. The amended complaint's failure to contain any allegations of adverse and substantial effects on interstate commerce stemming from plaintiffs' investments is, therefore, fatal to plaintiffs' position.[41]

Even assuming that interstate commerce in investments has been affected in some way by defendants' actions, I hold that any such effect would be too incidental, remote, and indirect to be cognizable under the Sherman Act. Common sense dictates that any supposed impact on the interstate investment of plaintiffs' revenues is several steps removed from the denial to plaintiffs of the opportunity to perform certain specialized cardiology procedures at CCMC. Indeed, plaintiff's theory of the supposed connection between defendants' actions and interstate investment of their revenues is based on the assumption, not supported by any allegations in the amended complaint, that any additional revenues derived from the performance of procedures at CCMC would be invested in plaintiffs' pension portfolio. As a result, plaintiffs have also failed to allege the required critical nexus between the alleged foreclosures by defend-

---

**39.** Again, at best, plaintiffs might be asserting an effect on their own practice, but not on interstate commerce. See text following note 26 supra. If we assume that some of the defendants are performing cardiology services on plaintiffs' patients and billing those patients for those services and that permitting plaintiffs to perform those services would result in plaintiffs billing their patients for those services instead of defendants, then all plaintiffs have alleged is a transfer of the billing function from defendants to plaintiffs. Because, in order to make out federal jurisdiction, it is necessary to allege an effect on interstate commerce and not just an effect on plaintiffs, such an allegation is insufficient to vest a federal court with jurisdiction. See part II.B.2. supra.

**40.** 44. In addition, the financing of plaintiffs' business, including the payment for cardiology services rendered by plaintiffs and the investments of the plaintiff Cardio-Medical's revenues and profits, involves the continuous

and unbroken stream of interstate commerce . . . .

 (h) Revenues of plaintiff Cardio-Medical's pension portfolio, which are managed from the State of Maryland, and hence operate in the continuous and unbroken stream of interstate commerce, being invested in the financial instruments of many domestic entities from outside the State of Pennsylvania, have been adversely affected and lessened by defendants' boycott and foreclosures.
Amended Complaint ¶¶ 44, 46(h).

**41.** My holding on this channel of interstate commerce is not based on the shifting argument developed earlier in this opinion. Plaintiffs' amended complaint does not even allege a shifting in interstate investments; the only allegation contained in the pleading is that of an effect on plaintiffs themselves.

ants and the effect on plaintiffs' pension investments.

### 9. Curtailment of Plaintiffs' Practice in Connection With a New Jersey Clinic

■ Plaintiffs allege in paragraph 46(i) of their amended complaint that their "practice in connection with a New Jersey Clinic and patients therefrom referred to plaintiff Cardio-Medical has been and is threatened with curtailment and foreclosure as a result of the defendants' unlawful activities." Further, plaintiffs allege in paragraphs 59(d) and 64(d) of their complaint, that in this respect, they "have been prevented from fully expanding and developing their practice." These allegations are also insufficient to satisfy the interstate commerce jurisdictional requirement of the Sherman Act.

■ The New Jersey practice allegations in plaintiffs' amended complaint fail to identify a relevant channel of interstate commerce. As with the medical personnel allegations discussed earlier, *see* part III. C.6. *supra,* this set of allegations refers to a supposed effect on the activities of the individual plaintiffs in their practice of medicine. As discussed above, the labor of a human being does not constitute a commodity or article of commerce for purposes of the Sherman Act. *See Daley v. St. Agnes Hospital, supra.* Further, at best, plaintiffs' New Jersey practice allegations refer only to effects on plaintiffs, not effects on interstate commerce. *See* text following note 26 *supra.*

Even under the most liberal of interpretations, plaintiffs' New Jersey practice allegations are insufficient to vest a federal court with jurisdiction. If plaintiffs intend to refer to the interstate travel of New Jersey patients as the appropriate channel of commerce, I have already ruled that such travel does not constitute a relevant channel of interstate commerce for federal jurisdictional purposes. *See* part III.C.1. *supra; Cardio-Medical,* 536 F.Supp. at 1081. In any event, because those New Jersey patients, by plaintiffs' own assertions, would travel to a clinic in New Jersey, and not

Pennsylvania, it is difficult to understand how *interstate* travel of patients is involved. If plaintiffs are referring to their own travel across state lines to conduct a practice in New Jersey, the New Jersey practice allegations would still be insufficient. This travel is completely incidental to plaintiffs' practice of medicine, which is performed only locally, whether in Pennsylvania or New Jersey.

Finally, plaintiffs have again failed to allege the critical nexus between defendants' challenged activities and this identified channel of interstate commerce. The explanation for this failure must be the impossibility in explaining how the denial to plaintiffs of the opportunity to perform limited specialized cardiology procedures at CCMC could have any impact whatsoever on plaintiffs' practice at a New Jersey clinic. Plaintiffs have not alleged that defendants have prevented them from going to New Jersey to practice, nor do they allege that defendants have sought to prevent New Jersey patients from seeking their services. Absent such allegations, it is unclear as a matter of logic how defendants have contributed to any difficulties plaintiffs might be able to prove that they have had in developing their New Jersey practice.

### 10. Lessening of Use of Out-of-State Continuing Education

■ In paragraph 46(e) of plaintiffs' amended complaint it is alleged that "[t]he use and application of plaintiffs' continuing education through out-of-state professional seminars, out-of-state publications and manuals, and other out-of-state sources, have been foreclosed and lessened as a result of defendants' allegedly anticompetitive activities." This allegation is also insufficient to establish jurisdiction under the Sherman Act.

All of the analysis supporting my holding that this identified channel of interstate commerce is insufficient to meet plaintiffs' jurisdictional burden has been thoroughly explored in earlier sections. First, this alleged effect is, taken at its best, an effect

only on plaintiffs, and not an effect on interstate commerce. *See* text following note 26 *supra*. Second, the out-of-state continuing education allegation refers to a supposed effect on the activities of the individual plaintiffs in their practice of medicine. Because the labor of a human being does not constitute a commodity or article of commerce for purposes of the Sherman Act, *see* part III.C.6. *supra; Daley v. St. Agnes Hospital, supra,* such an allegation is insufficient to satisfy the affecting commerce theory. Finally, plaintiffs' allegations with respect to this channel of commerce contain no reference to the required nexus between the actions of defendants and the effects allegedly felt on interstate commerce. It is inconceivable that plaintiffs' inability to perform a limited number of specialized cardiology procedures has any logical relationship to the interstate market in continuing education.[42]

### 11. Summary

This opinion has discussed, in concededly painstaking detail, each of plaintiffs' interstate commerce allegations. As a result of the foregoing analysis, I hold that the allegations contained in plaintiffs' amended complaint are legally insufficient to meet the interstate commerce requirement of the Sherman Act. Notwithstanding the extensive guidance provided to plaintiffs by the initial opinion in this case, and notwithstanding the added assistance of new counsel, the amended complaint does not provide the allegations necessary for this court to find (i) a relevant channel of interstate commerce; (ii) a substantial and adverse effect upon interstate commerce; and (iii) a logical nexus between the challenged activities of defendants and the effect on the relevant channel of commerce identified.

Although plaintiffs' counsel have made a valiant attempt to plead properly a valid cause of action, they, like the court, are constrained by the facts in the instant case. Plaintiffs' amended complaint contains little more than a greater number of the same type of allegations characterized as "vague, broad, and conclusory" by the initial opinion in this case. *See Cardio-Medical,* 536 F.Supp. at 1080. Thus, although plaintiffs have attempted to make up in quantity what they lack in substance, the whole complaint cannot be greater than the sum of its parts—and the sum of ten zeroes still equals zero.

### D. Consistency With Prior Precedent

My holding that plaintiffs' amended complaint fails to contain sufficient allegations to satisfy the interstate commerce requirement of Sherman Act jurisdiction is supported amply by earlier precedent. No fewer than fifteen courts deciding antitrust cases involving the health-care industry have concluded that allegations quite similar to those found in plaintiffs' amended complaint are insufficient to vest a federal court with jurisdiction. In particular, the *Wolf, Riggall, Barr, Grigg, Daley, Moles,* and *Capili* cases directly support the result reached in this opinion. These cases discuss and analyze such channels of interstate commerce as the interstate flow of revenues, travel for the purpose of medical care, the use and purchase of medical equipment and supplies, the prescription of drugs and medications, and the market for medical personnel services, and find none of these channels, in any combination, sufficient to satisfy the jurisdictional requirements of the Sherman Act.[43]

---

**42.** In Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion to Dismiss it is suggested that the channel of interstate commerce affected by the lessening of use of out-of-state continuing education is that of interstate travel by plaintiffs for purposes of furthering their professional education. *Id.* at 40. To the extent that this is the identified channel of interstate commerce that plaintiffs claim is affected by defendants' challenged activities, I reject it as being too incidental and remote and as being

irrelevant under the standards articulated in Judge Becker's decision in *Daley. See* part III.C.9.

**43.** Bearing in mind the instructions of the Third Circuit in *Doctors, Inc.* and *Harold Friedman, Inc.,* to the effect that an evaluation of the sufficiency of interstate commerce allegations requires a practical, case-by-case analysis, the facts of this case present an even more compelling rationale for dismissal than in any of the previously decided cases. Plaintiffs in this case

Further, within the terms of the framework explained in part II.C. *supra,* my holding is fully consistent with the previously decided Supreme Court, Third Circuit, and other denial of hospital staff privileges precedents. For example, plaintiffs' assertion that the interstate commerce allegations in *Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), "are almost on all fours with the interstate commerce allegations here," Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion to Dismiss at 15, is simply incorrect. Although *Hospital Building Co.* did involve a hospital defendant, and therefore channels of commerce similar to those suggested by plaintiffs in the instant case were discussed by the Supreme Court, the similarity between the two cases ends at that point.

In *Hospital Building Co.,* plaintiff alleged that defendants had conspired to halt the planned expansion of plaintiff's hospital. Thus, plaintiff alleged that, if defendants' conspiracy succeeded, (i) the plaintiff's purchases of out-of-state medicine and supplies, as well as its revenues from out-of-state insurance companies, would be substantially lessened; (ii) management fees that plaintiff paid to its out-of-state parent corporation would be diminished; and (iii) the multi-million dollar financing for the expansion, a large portion of which would come from out-of-state lenders, would not take place.

Given this explanation of the *Hospital Building Co.* facts, that case is totally distinguishable from plaintiffs' claims here. First, with respect to the sheer magnitude of the amount of interstate commerce involved, it is apparent that, if any interstate commerce is implicated by defendants' action in this case, it is miniscule in comparison to that involved in *Hospital Building Co.* The interstate commerce activities of the four local plaintiff-physicians suing in this action, do not even come close to approaching those of the plaintiff in *Hospital Building Co.,* a large hospital building company, whose parent company, headquartered in Georgia, operated in a number of states.

Second, the conspiracy challenged in *Hospital Building Co.,* if successful, would have blocked totally the planned expansion of plaintiff's new hospital. Certain events, such as the purchase of out-of-state supplies and interstate financing, would not have taken place if defendants' conspiracy succeeded. In contrast, the alleged restraint in the instant case relates only to the ability of plaintiffs to perform a limited number of cardiology procedures at defendant CCMC. There is no allegation that defendants have sought to foreclose plaintiffs from attending their patients at CCMC, performing cardiology procedures in their office, or pursuing their practice of medicine anywhere else.

The Third Circuit cases relied on by plaintiffs are also distinguishable from this action and are, therefore, not dispositive of the jurisdictional issue. In each of the two primary Third Circuit cases cited by Cardio-Medical, the plaintiffs were able to establish a readily apparent nexus between the defendants' challenged activities and the alleged effect on interstate commerce. Further, the plaintiffs in the Third Circuit cases also demonstrated that a significant amount of interstate commerce was affected by defendants' actions.

For example, in *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* plaintiff alleged that the necessary effect of defendants' alleged conspiracy to terminate plaintiff's Blue Cross membership would be complete closure of plaintiff's operations and total elimination of its $2 million annual purchases of supplies in interstate commerce. Similarly, in *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* plaintiff, operator of a supermarket, was eliminated from

already have staff privileges at defendant CCMC; they have been denied only the right to practice certain additional specialized cardiology procedures. Such a limited, partial restraint—in stark contrast to the total denials of privileges involved in the above-cited cases— makes it impossible, as a matter of logic, for plaintiffs to establish either substantiality or nexus during the course of this litigation.

a shopping center as a result of an "exclusivity clause" obtained by one of its competitors, also operating in the shopping center. In concluding that plaintiff had satisfied the interstate commerce requirement of the Sherman Act, the Court of Appeals in *Harold Friedman, Inc.,* relied on the facts that the case involved a nationwide supermarket chain and that the value of products travelling in interstate commerce greatly exceeded the amount involved in the *Hospital Building Co.* case.

Thus, the applicable Supreme Court and Third Circuit precedents are distinguishable from the present case with respect to both (i) the nature of the alleged restraint and the obvious nexus between that restraint and the alleged effect (i.e. total elimination of plaintiff as a competitor), and (ii) the magnitude of interstate commerce involved.

Aside from *Hospital Building Co., Doctors, Inc.,* and *Harold Friedman, Inc.,* twelve other courts considering denial of hospital staff privileges claims or other health-care industry issues have concluded that federal jurisdiction exists on allegations similar to those in the instant case. Putting aside the Third Circuit's warning that precedent is not going to be particularly helpful in deciding antitrust jurisdictional cases, *see Doctors, Inc.,* 490 F.2d at 51, eleven of those cases are easily distinguishable from the facts of the instant case. First, all twelve of the adversely decided cases except *Stone v. William Beaumont Hospital, supra,* involve total restraints infringing on the very ability of the plaintiffs to remain in the market as a meaningful competitor. In contrast, the limited, partial restraint alleged in this case cannot logically be deemed to have anywhere near this substantial an effect. Second, three of the adversely decided cases (*Feminist Women's Health Center, Inc., Ballard,* and *Feldman*) were brought either on behalf of a class of physicians or on behalf of a hospital. As a matter of logic, the four local physicians suing in this case cannot hope to establish the substantiality and causal nexus that the plaintiffs in those three cases alleged. Finally, in eight of the remaining adversely decided cases, the individual physicians suing had hospital-based practices. The threat to these plaintiffs as competitors cannot even be compared, either as a matter of substantiality or nexus, to the remote threat to the four local physicians with a concededly non-hospital based practice involved in the instant case. Thus, only the Eastern District of Michigan decision in *Stone* cannot be harmonized with the result reached in the instant case. And to that extent, I am forced to disagree with Judge Guy's conclusion.[44]

**44.** My disposition of defendants' motion to dismiss in this matter makes it unnecessary for me to reach the additional standing/nexus argument raised by defendant Cardiology Associates. Although I confess some continued puzzlement as to the precise significance of defendants' additional argument, I should state for the record that I do not find it at all persuasive.

As I understand it, Cardiology Associates is essentially arguing that the denial of the right to practice the specialized cardiology procedures runs only to the individual plaintiffs and not to the corporate plaintiff. As a result, it is argued that there is no nexus between the denial of privileges to the individual plaintiffs and any harm suffered by the corporate plaintiff. Further, Cardiology Associates argues that no harm runs to the individual plaintiffs because all of the financial harm falls on the corporate plaintiff. As a result, defendant argues that there is no causal connection between defendants' activities in this case and the harms suffered by the various plaintiffs.

To the extent defendant Cardiology Associates' argument rests on pure standing analysis, I reject it. *See Blue Shield of Virginia v. McCready,* —— U.S. ——, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *Bogus v. American Speech and Hearing Ass'n,* 582 F.2d 277, 286 (3d Cir. 1978); *Bravman v. Bassett Furniture Industries, Inc.,* 552 F.2d 90 (3d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977); *Cromar Co. v. Nuclear Materials & Equipment Corp.,* 543 F.2d 501 (3d Cir.1976).

To the extent Cardiology Associates' additional argument rests on a nexus analysis, I also reject it. The two cases cited by defendant in support of its argument, *McDonald v. St. Joseph's Hospital of Atlanta, Inc.,* 524 F.Supp. 122, 126 (N.D.Ga.1981); *Brown v. Indianapolis Board of Realtors,* 1977–1 Trade Cas. (CCH) ¶ 61,435 (S.D.Ind.1977), reached their holdings with mere conclusory statements and no analysis or discussion of the precedents. Further, accepting defendant's argument would ascribe enormous consequences to a routine, business decision to obtain the benefits of the Pennsyl-

## IV. Conclusion

Plaintiffs have suggested several times throughout these proceedings that both defendants and this court have attempted to apply a "special" analysis to plaintiffs' interstate commerce allegations so as to insulate hospital defendants from the full and customary reach of the Sherman Act. As this opinion adheres strictly to traditional antitrust analysis, plaintiffs' suggestion is incorrect. Ironically, because plaintiffs refuse to accept the reality that the Sherman Act does not extend to every type of restraint, no matter how local in nature, it is plaintiffs who seek to have this court apply a "special" rule to the instant case. As stated in *Rasmussen v. American Dairy Ass'n,* 472 F.2d 517, 526 (9th Cir.1972), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973), "there must be some limit on the intrusiveness of Sherman Act regulation." Plaintiffs' amended complaint challenging the limited denial to them of the opportunity to perform certain specialized cardiology procedures at CCMC, represents precisely the type of claim that warrants application of that rule. If antitrust jurisdiction can be invoked on the basis of these plaintiffs' allegations, virtually all activities, even if purely local, and including our hypothetical house painter, would be subject to federal antitrust scrutiny. As a matter of policy and legal precedent, such a result would be absurd.

Plaintiffs have cited ten categories of allegations that they contend satisfy the interstate commerce requirement of the antitrust laws. As discussed in detail throughout this opinion, each of these identified channels of interstate commerce is legally deficient under the tripartite jurisdictional analysis adopted by this court.

Plaintiffs have been equally unsuccessful in their invocation of the "in commerce" jurisdictional standard. Thus, plaintiffs have fulfilled the prediction made in the initial *Cardio-Medical* opinion that the facts of this case would not support an amended complaint vesting a federal court with jurisdiction. *See Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center,* 536 F.Supp. 1065, 1085 (E.D.Pa.1982).

Notwithstanding its affirmance of federal court jurisdiction, the Tenth Circuit in *Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715 (10th Cir.1981) (*en banc*), stated that "interstate commerce is not implicated for Sherman Act purposes every time someone is excluded from a staff, organization, association or other membership." *Id.* at 726. This case provides a clear illustration of that principle. Plaintiffs have now had two opportunities to plead sufficient factual allegations to vest this court with jurisdiction. In light of this repeated failure to allege a legally cognizable antitrust claim, and in light of my holding that plaintiffs can prove no set of facts that would satisfy the interstate commerce requirement of the Sherman Act, I dismiss plaintiffs' amended complaint with prejudice and direct that judgment be entered in favor of all defendants.

---

vania Professional Corporation Law. It baffles me why individual physicians who incorporate and who are then denied staff privileges at a hospital are caught in the "catch-22" situation in which no plaintiff can sue. Finally, defendants' argument that plaintiffs' refusal to supply financial data on the individual plaintiffs on the ground that all damage has accrued directly to the corporation is not dispositive on the issue of nexus. Defendant's remedy to this problem lies in a motion to compel, not a motion to dismiss.